Elfant, Appellant, *v.* Clauss.

Argued September 15, 1961. Before ERVIN, WRIGHT, WOODSIDE, WATKINS, and FLOOD, JJ. (RHODES, P. J., and MONTGOMERY, J., absent).

Before GROSHENS, J.

*Irwin S. Lasky,* for appellant.

*Jerome B. Apfel,* with him *Henry J. Morgan,* and *Blank, Rudenko, Klaus & Rome,* for appellees.

OPINION BY WATKINS, J., January 16, 1962:

This is an appeal from a decree in equity of the Court of Common Pleas of Montgomery County, dismissing the complaint of Martin M. Elfant, the plaintiff-appellant, for the rescission of an agreement and the return of purchase money.

In November, 1958, Martin M. Elfant, the plaintiff, filed a complaint in equity seeking specific performance with a partial price abatement under an agreement of sale for the purchase of a new house, located in Huntingdon Valley, Montgomery County, Pennsylvania. It appeared at the trial of the case before Judge GROSHENS, sitting as Chancellor, that one, Michael J. Goll, a named defendant, was an innocent purchaser for value so that it was agreed by counsel for the parties that the question to be decided was one of rescission and return of purchase money under the agreement of sale. The Chancellor found for the defendants

and the court en banc overruled the plaintiff's exceptions to the decree nisi that it was against the weight of the evidence and the law and entered a final decree dismissing the complaint.

The facts were found as follows: "1. Plaintiff and defendants entered into an agreement of sale for the purchase of premises 526 Susquehanna Road, Huntingdon Valley, Pennsylvania, on March 11, 1958. 2. Plaintiff, Martin M. Elfant, is a real estate broker with thirteen years of experience in the real estate business, including experience in Abington Township and elsewhere in Montgomery County. 3. In January or February 1958, plaintiff inspected the premises 526 Susquehanna Road with a view towards purchasing said premises from defendants. 4. At the time of said inspection the property was known as Lot No. 34 and was included on a subdivision plan of Section VII, Woodridge Farms, which contained the exact dimensions of said property, and which had been duly recorded on January 15, 1957, in the office of the Recorder of Deeds of Montgomery County, Plan Book B-3, page 60. 5. At the time of said inspection, a copy of the subdivision plan showing the dimensions of said property, was displayed in a plainly visible manner in the kitchen of a sample house, about two blocks away on the same tract. 6. Plaintiff had been in that sample house prior to signing the agreement for the property in question, and at the time the plaintiff began negotiating the property, he knew that the lot in question was part of a larger tract. 7. At said time, plaintiff knew that there was a plot plan covering the premises in question and that the property in question was known as Lot No. 34 on such plot plan. 8. The plaintiff prepared the agreement of sale March 11, 1958 for the premises in question, which agreement of sale stated the size of the lot to be 104 feet by 140 feet. 9. The lot in question is on a curve which was plainly appar-

ent to the plaintiff at the time he saw the property on January, 1958. The frontage of the property is actually 78 feet on a straight line, and 26 feet on the curve or arc. 10. The lot in question was seeded and graded at the time plaintiff signed the agreement of sale, and was the only one that had seeded grass. The adjoining lots were not seeded and graded, and the boundaries of the lot in question were clearly definable because of its seeded and graded condition. 11. At the time plaintiff signed the agreement of sale, there was a swale or gutter along the boundary line on each side of the lot in question, clearly outlining of the boundaries of the lot. 12. At least as early as April, 1958, plaintiff observed an excavation in the area where they now contend their boundary line was represented to have been located. They were told at that time that the excavation was for a swimming pool and was on the adjoining lot. 13. In April 1958, plaintiff received from the Frankford Trust Company the title certificate for the lot in question, which contained a full description of the dimensions of the lot, by feet and inches, and the plaintiff had a deed for the property prepared in his office, on his form, which deed contained a full description of the property taken from the certificate. 14. Plaintiff made no complaint about the size of the lot until May 8, 1958 at the Frankford Trust Company, the time and place fixed for settlement. 15. Plaintiff refused to make settlement for the property on May 8, and the defendants rescheduled the settlement for May 14, 1958 and notified the plaintiff, but plaintiff did not appear at the settlement. On August 12, 1958, plaintiff, through his attorney, advised defendants of his intention to rescind the transaction because of the size of the lot. 16. On October 3, 1958, the defendants conveyed the property to Michael J. Goll, an innocent purchaser for value. At the time of the said conveyance, neither Goll nor the defendants Clauss had been served with plaintiff's

complaint nor had they any knowledge of the pendency of plaintiff's suit, however, there was a lis pendens as of this date. 17. Prior to the date fixed for settlement the plaintiff Martin M. Elfant prepared a letter containing a list of items which defendants agreed to complete as a condition of plaintiff's making settlement May 8, 1958."

The plaintiff contends that as "equity abhors a forfeiture or penalty" and the defendants have the Three Thousand ($3000) Dollar deposit and have resold the house, the retention of the down money falls into that category. The clause in question reads as follows: "Should the purchaser fail to make settlement as herein provided or default in performing any other covenants or conditions of this agreement, the sum or sums paid on account of the purchase price may be retained by the seller as liquidated damages or on account of the purchase price, as the seller may elect, and, if retained as liquidated damages, this contract shall become null and void and cancellation shall automatically take place."

The defendants contend that the retention of the Three Thousand ($3000) Dollars is liquidated damages under the above provision of the agreement of sale. The record shows the sale price to be Thirty Thousand ($30,000) Dollars under the agreement of sale and the down money Three Thousand ($3000) Dollars. The property was resold after default by the plaintiff for Twenty-Eight Thousand Two Hundred Fifty ($28,250) Dollars. The defendants incurred additional carrying charges of $100 monthly for five months and a broker's commission of $600, which would not have been incurred had settlement been made according to the agreement of sale. The defendants suffered extensive damages as a result of the default and the sum of Three Thousand ($3000) Dollars is the reasonable liquidated damages contemplated by the agreement of sale.

The record also contains extensive testimony relating to the construction of the house on lot No. 34. The objections made to the workmanship on the house came after the institution of this suit. The sole objection to the completion of the settlement on May 8, 1958, was the alleged discrepancy in the size of the lot. The notice of rescission gave the size of the lot as the cause of complaint. "It is a firmly established principle, founded on the doctrine of equitable estoppel, that a refusal to perform the obligations of a contract on the ground of a specific breach assigned as the reason for such refusal, constitutes a waiver of all other breaches then known to him; where a party gives a reason for his conduct and decision touching anything involved in a controversy, he cannot, after litigation has begun, change his mind, to the detriment and disadvantage of the other party, and seek to justify his action by advancing some other reason": *Warner Company v. MacMullen*, 381 Pa. 22, 28, 112 A. 2d 74 (1955).

The record further shows that there was an agreement that five specific items were to be completed in the construction of the house as a condition to plaintiff's settlement on May 8, 1958. This was in writing in the form of a letter and a part of the record. Four of the items had to await work obliged to be done by the plaintiff and the fifth had been taken care of prior to the date for settlement. We agree with the defendants that the value of the unfinished items in relation to the purchase price of the property was de minimis.

The real issue in this appeal is whether the plaintiff is entitled to the equitable remedy of the rescission of the agreement so as to be entitled to a return of the down money. We agree with the disposition of this question made by the Chancellor in his adjudication, which was adopted by the court en banc as its opinion in support of the final decree dismissing the complaint, which reads as follows:

"The plaintiff filed a complaint in equity whereby he sought specific performance of an agreement to convey realty, with a partial abatement in price because the size of the lot was less than that which the parties had agreed would be conveyed.

"Plaintiff's counsel agrees, however, that since the present occupants of the premises are innocent purchasers, it would be inequitable for this court to uproot them from their home in order to decree specific performance. Accordingly, the plaintiff no longer prays for specific performance, but that the court order the return of his down monies.

"Whether or not the plaintiff is entitled to his down monies is, therefore, the only issue before the chancellor.

"Plaintiff contends that the size of the lot in question was misrepresented to him in that, while the defendant said that the dimensions of the lot were 104 feet by 140 feet, which implies a rectangle of these dimensions, in fact, the lot was irregular in shape, having a rear width of only 74 feet. Further, since such misrepresentation did occur, he is entitled to rescission of the agreement of sale and the return of his down monies.

"The agreement of sale contained a liquidated damages clause whereby in the event of a default on the part of the purchaser, the seller is entitled to retain the down monies as liquidated damages. Since it is an agreed fact that the plaintiff was unwilling to complete the sale, the right of the plaintiff to the return of his down monies turns on his right to the equitable remedy of rescission.

"The plaintiff has failed to establish by the fair preponderance of the evidence, that the alleged misrepresentation did in fact occur.

"An agreement of sale, like any contract, is construed against the party who prepared it. The plain-

tiff prepared the agreement in this case which described the lot by setting forth only the front footage and the depth, both of which are entirely in accord with the actual dimensions. Further, the plaintiff is an experienced real estate broker who could easily have made certain that the agreement called for a rectangular lot, if that is what was intended. Even if a misrepresentation did in fact occur, the plaintiff is not entitled to rescission unless his reliance upon it was justifiable: Restatement of Torts, Section 537. Moreover, the recipient of such a fraudulent misrepresentation is not justified in relying upon its truth if its falsity is obvious: Restatement of Torts, Section 541.

"The plaintiff not only had means readily available to ascertain the truth or falsity of the alleged misrepresentation, but he was confronted by many physical factors that would have raised questions as to the dimensions of the lot in the minds of men far less experienced than was the plaintiff.

"The plot plan showing the precise dimensions of the lot was recorded in the office of the Recorder of Deeds. Moreover, a copy of the plot plan was posted in a plainly visible manner in a sample house which the plaintiff had visited.

"The boundaries of the lot and the fact that it was irregular were obvious from a physical inspection of the lot. The lot in question was on a curve, which would put anyone on notice of its irregular shape. The lot was seeded and graded while the adjoining lots were not and there was a swale or gutter along the boundaries of the lot which clearly defined its extent.

"Where the means of acquiring the information and dimensions of the lot were available to the plaintiff, and he was not hindered or prevented in any way from making his own investigation, he is barred by his own negligence from any recovery: Sebring v. Niles Fire Brick Co., 292 Pa. 412 (1928).

"The plaintiff could have learned either by physical inspection of the ground or by inspecting the plot plan, the exact dimensions of the property. By his own testimony, he did not bother to do either, therefore his own negligence, not any alleged misrepresentation, is the cause of his difficulty, and he is entitled to no relief."

Decree affirmed.