Commonwealth of Pennsylvania, Department of Transportation, Petitioner *v.* Acchione and Canuso, Inc., Respondent.

Argued June 4, 1980, before President Judge CRUMLISH and Judges WILKINSON, JR., ROGERS, BLATT, CRAIG and MACPHAIL. Judges MENCER and WILLIAMS, JR. did not participate.

66

[REDACTED]

*Paul A. Logan,* Assistant Attorney General, with him *John T. Kalita, Jr.,* Assistant Attorney General, *Robert W. Cunliffe,* Deputy Attorney General, and *Edward G. Biester, Jr.,* Attorney General, for petitioner.

*Marvin Comisky,* with him *Richard M. Rosenbleeth, Alan C. Gershenson,* and *Michael Minkin,* of counsel, *Blank, Rome, Comisky & McCauley,* for respondent.

OPINION BY PRESIDENT JUDGE CRUMLISH, December 2, 1980:

This is an appeal of the Pennsylvania Department of Transportation (PennDOT) from a Board of Claims' decision awarding $191,272.05 in damages to claimant Acchione and Canuso, Inc. (Acchione).

We reverse.

These facts are pertinent. On October 5, 1973, general contractor Acchione and PennDOT entered into a contract for highway improvements to Roosevelt Boulevard in Philadelphia. Trenching excavation work was necessary to replace conduit encasing traffic signal wiring at existing intersections.[1]

After reviewing the project plans, subcontractor Tony DePaul & Sons, Inc., noted a discrepancy between its calculation of 16,658 lineal feet of trenching and the bid materials calling for 13,131 lineal feet. As

---

[1] Although the contract did not categorize types of trenching, the plans and specifications indicated earth, pavement and roadway trenching.

a result, DePaul telephoned PennDOT's engineers and was informed that PennDOT had directed its engineers to assume that approximately half of the existing conduit would be reusable. Relying on its own calculations and this oral representation, DePaul arrived at a unit price of $24.00 by averaging the cost per lineal foot of earth, pavement and roadway trenching.[2]

In the course of the project, PennDOT discovered most of the conduit was not reusable, and that the engineers had failed to include a contingency item in the contract for this eventuality. PennDOT orally directed DePaul to perform the necessary trenching and then executed a written work order calling for an additional 17,433 lineal feet at the contract unit price. When the job was completed, Acchione was paid at this contract rate for all work performed, 34,738.70 lineal feet.

However, in 1976, Acchione filed a complaint with the Board requesting increased compensation for all trenching performed, alleging that its cost per lineal foot substantially increased because the majority of the additional work was the more expensive roadway trenching.[3] The Board of Claims awarded additional compensation, finding that the increased amount of trenching materially changed the character of the work to be performed under the contract.

―――――――

[2] Since trenching costs vary per category, DePaul calculated the unit price as 9,759 lineal feet of *earth trenching* at $13.00/l.ft., 3,033 lineal feet of *pavement trenching* at $23.00/l.ft., and 3,866 lineal feet of *roadway trenching* at $52.00/l.ft. These amounts were used in the following formula:

$$(9,759 \text{ l.ft. earth} \times \$13.00) + (3,033 \text{ l.ft. pavement} \times \$23.00)$$
$$+ (3,866 \text{ l.ft. roadway} \times \$52.00) =$$
$$\frac{397,658}{16,658 \text{ l.ft.}} = \$23.87/\text{l.ft.}$$

[3] Acchione submitted that its cost per lineal foot increased by $6.14. It sought an additional $6.14 for *all* trenching completed, including trenching done under the original contract and pursuant to PennDOT's additional work order.

PennDOT raises two primary issues: whether Acchione timely filed its claim with the Board and whether the Board erred in its construction of the contract.

## Timeliness of the Claim

By the terms of Acchione's contract[4] and Section 6 of the Arbitration Act, Act of May 20, 1937, P.L. 728, *as amended,* 72 P.S. §4651-6, the Board's jurisdiction is dependent on the contractor filing its claim with the Board within six months of the date the claim accrues. The contract further provides that an aggrieved contractor must notify PennDOT of its intention to file a claim with the Board within ten days of the completion of all or part of the work in question.[5]

On August 4, 1975, after substantially all trenching was completed, Acchione wrote to PennDOT requesting an adjustment in the contract unit price. The request was denied by letter dated November 17, 1975.

---

[4] Department of Highways (now Department of Transportation) specifications, Form 408, are incorporated by reference into the contract. Section 109.09 provides in pertinent part:

> [T]he contractor . . . shall [not] be entitled to present any claim . . . to the Board . . . unless such claim . . . shall have been presented . . . within 6 months from the date the claim accrued . . . and, 'the date that the claim accrued' shall be that date on which . . . the engineer notifies the contractor . . . in writing, that the said claim has been rejected or denied. . . .

[5] Section 109.09 provides in pertinent part:

> [T]he contractor . . . shall [not] be entitled to present any claim . . . to the Board of Arbitration of Claims . . . for additional compensation . . . unless . . . it shall have given . . . the engineer a 10-day due notice in writing of . . . its intention to present a claim. . . .

> The 'due notice in writing', as required above, must have been given to . . . the engineer within 10 days of the time the contractor performed such work or any portion thereof. . . .

PennDOT contends the August 4th letter provided notice of Acchione's intent to file a claim, and that the claim accrued on November 17, 1975 when PennDOT denied Acchione's request. PennDOT further contends the contractor's December 15, 1976 filing with the Board was untimely since it occurred more than six months after PennDOT's November 17, 1975 denial. We disagree.

We read Section 109.09 to require a clear statement by the contractor of his intent to file a claim so as to enable PennDOT to carefully consider the contractor's claim before relief is sought with the Board. The August 4th letter fails to evidence an intent by Acchione to file a claim, and therefore Acchione's claim did not accrue on November 17, 1975 as PennDOT would have us believe. On January 6, 1976, Acchione wrote a second letter renewing its request for more money and seeking a meeting with PennDOT personnel to resolve the matter. Though a meeting was held and the request again denied on January 29, 1976, no intent is found to this date.[6]

However, Acchione provided, by letter dated March 16, 1976, the 10-day notice of intent to file a claim, since the record reveals that the disputed work was not completed until March 30, 1976. Acchione's claim then accrued on June 21, 1976, when PennDOT notified the contractor that its claim had been denied. Accordingly, we must conclude that Acchione timely filed its claim with the Board on December 15, 1976, well within six months of PennDOT's June 21st denial.

---

[6] Acchione mistakenly relies on *Commonwealth v. Loffredo*, 16 Pa. Commonwealth Ct. 237, 328 A.2d 886 (1974), in claiming that these repeated attempts to settle the dispute were part of an on-going internal arbitration procedure. The *Loffredo* arbitration procedure was not only provided for by agreement but the parties intended that the cause of action would not accrue until arbitration was attempted. Here, no internal arbitration procedure is detailed by the contract.

## Construction of the Contract

After extensive hearings, the Board concluded that PennDOT committed constructive fraud based on two items of evidence, an omission in the plans of a contingency item for additional trenching and an oral statement made by PennDOT's engineers to DePaul that PennDOT assumed half the existing conduit was reusable. We cannot agree.

Our courts have found constructive fraud in cases where the Commonwealth possessed information which was not disclosed to the contractor, who consequently suffered pecuniary harm. In *Pennsylvania Turnpike Commission v. Smith,* 350 Pa. 355, 39 A.2d 139 (1944), the Commission had knowledge that the area to be excavated was primarily rock, yet the prepared plans indicated loose earth. Our Supreme Court held that such concealment of facts amounted to constructive fraud and would not be protected by self-exonerating clauses in the contract. The determinative factor in *Smith* was the "actual misrepresentation of adverse conditions known to the entity inviting bids." *Central Penn Industries v. Department of Transportation,* 25 Pa. Commonwealth Ct. 25, 30, 358 A.2d 445, 448 (1976).

In this case, there is no evidence that PennDOT purposefully failed to include a contingency item for additional trenching or knew that substantially more than half the conduit was not reusable; nor can an inference of fraud be drawn from the facts. DePaul relied at its peril on the engineer's oral representation as to the reusability of conduit. There are simply no circumstances that would allow us to ignore the contractor's covenant that it shall not "plead misunderstanding or deception because of . . . estimate[s] of quantities or . . . the character of the work.'"[7] There-

---

[7] Section 102.04 of the Form 408 specifications.

fore, if Acchione is to recover, it must be under the terms of its agreement with the Commonwealth.

On December 31, 1974, PennDOT ordered Acchione, in writing, to perform the additional 17,433 feet of trenching at the contract unit price. Acchione worked under this order over eight months and completed the majority of the trenching before it made any objection to PennDOT's directive. The narrow issue presented by this case is whether Acchione is barred from recovery because it failed to seek increased compensation at the time additional work was ordered.

The Board concluded that the additional trenching materially changed the character of the work and/or the unit cost. Under the terms of the contract, Acchione and PennDOT were required to either negotiate a price adjustment[8] or institute a "force-account" pro-

---

[8] Section 109.03 provides:

The drawings and specifications herein referred to may be modified or altered at any time by the engineer in writing if such changes are necessary to update, adjust, accept, or fully complete the work contemplated by the contract.

Current and/or additional work involved in such changes will be paid for at the contract unit price. However, if such changes materially increase or decrease the unit cost of the work, or if work not contained in the contract is required, payment will be made as extra work in accordance with the provisions of Section 109.04(c).

Section 109.04(c) provides:

(c) Extra Work. Any work having no quantity and/or price included in the contract, and current or additional work requiring an adjustment in price as provided in Section 109.03, will be performed as extra work, at a price to be negotiated between the engineer and contractor, and ordered in writing by the engineer.

If a fair and equitable unit price or lump sum cannot be determined by the engineer, or where this method of payment is impractical, the engineer will, in writing, order the contractor to perform the work, as extra work on a force-account basis, in accordance with the provisions of subsection (d).

cedure[9] if the contract unit cost was substantially affected by the increase in trenching. PennDOT was justified in assuming that an increase in the lineal footage of trenching would not affect the unit price and was under no duty to negotiate an increase.

Conversely, considering both the manner in which its bid was prepared and the nature of the work involved, Acchione was in the best position to foresee the consequences of an increase in trenching and to initiate negotiations with PennDOT. It is clear that the contract procedures were designed to not only resolve the issue of increased costs at the time additional work is ordered but prevent the situation where a contractor like Acchione performs work without keeping track of actual expense and then later claims increased costs.

Our analysis is not affected by the Board's finding that Acchione did not realize that its costs had increased until July of 1975. We do not conclude that Acchione should have *known* that the additional trenching would cost more, but merely hold that Acchione knew additional work would be paid for at the contract unit price unless (1) an increase was negotiated with the engineer when the additional work was ordered or (2) the work was done on a force-account basis. By failing to utilize either of these alternatives, Acchione bore the risk that the work would cost more.

Although our review of this case compels us to deny recovery of more than the contract price, we are not insensitive to the problems and complexities inherent in government contracts. We cannot lend support to a strict constructional view that would require contractors to cease work and negotiate or renegotiate an agreement with every unforeseen occurrence before it

9 Section 109.04(d) of the Specifications provides for a "force-account" procedure whereby the contractor prepares a detailed estimate of cost to be approved by PennDOT before commencement of the work.

proceeds to perform its obligation under the contract. To so hold would not only prove practically and financially disastrous to contractors, but damaging to those citizens of our Commonwealth who have a vital interest in the prompt finality of locally important public projects.

However, Acchione's predicament is not the result of its efforts to expeditiously perform the contract obligations. On the contrary, the contractor's successive failure to carefully prepare its bid, to make certain that the additional amounts of trenching would not affect the contract's unit price, or to follow the established contract procedures bar recovery beyond the bid price. Regretfully for the contractor, reliance on unregulated inferences and practices cannot be found by us to cure errors of interpretation and tacit understandings in the execution of public contracts.[10]

Accordingly, the decision of the Board of Claims awarding $191,272.05 in damages to Acchione and Canuso is set aside and judgment is entered in favor of the Commonwealth.

## ORDER

The decision of the Board of Claims, dated January 31, 1979, awarding $191,272.05 in damages to Acchione

---

[10] Since we have determined that no award is allowed, it is unnecessary to discuss damages. However, we note that we cannot accept Acchione's method of calculating damages by merely inserting new figures into its original bid formula (see n. 2, infra).

It is axiomatic that a party must establish entitlement to damages before an amount is even considered. Gordon v. Trovato, 234 Pa. Superior Ct. 279, 338 A.2d 653 (1975). Acchione has neither produced evidence of actual increased expense involved in performing the additional trenching nor proven it suffered any actual loss. Even if Acchione had followed contract procedure, we could not permit recovery where there is no basis upon which to assess damages. Donahue v. R. C. Mahon Company, 219 Pa. Superior Ct. 210, 280 A.2d 563 (1971).

and Canuso, is hereby set aside and judgment is entered in favor of the Commonwealth.

Judge Rogers dissents.