476 A.2d 427

Nelson G. TYUS, Jr. and Frances A. Tyus

v.

Richard RESTA and Patricia Resta, Appellants,

v.

Nelson G. TYUS, Jr., and Frances A. Tyus.

Superior Court of Pennsylvania.

Argued Jan. 13, 1982.

Filed April 19, 1984.

Petition for Allowance of Appeal
Denied Aug. 14, 1984.

12

14

16

Robert R. Stone, Pittsburgh, for appellants.

Craig E. Wynn, Aliquippa, for appellees.

Before HESTER, BECK and VAN der VOORT, JJ.:

BECK, Judge:

Appellant/Builder-Vendors[1] Richard and Patricia Resta ("Vendors") appeal an order of the Court of Common Pleas of Beaver County which denied their post-trial motions for a judgment n.o.v. or a new trial. We affirm the order of the trial court.

On August 23, 1976, the Vendors entered into a contract with Appellee/Buyers Nelson and Frances Tyus ("Buyers") for the sale of a newly constructed house. As a corollary to the contract, the parties agreed that pending the sale of the Buyers' former house in Arkansas, the Buyers would initially occupy their new house as lessees. The Buyers leased their new home from August of 1976 until March 7, 1977, on which date the Vendors executed a general warranty deed conveying the house and its lot to the Buyers.

On May 12, 1978, the Buyers filed a complaint in assumpsit which alleged, *inter alia*, that "various defects ...

---

1. "A builder-vendor, as the term is here employed, refers to one who buys land and builds homes upon that land for purposes of sale to the general public." *Elderkin v. Gaster*, 447 Pa. 118, 123 n. 10, 288 A.2d 771, 774 n. 10 (1972).

occurred in [their] house which were the direct cause of [the Vendors'] poor workmanship in building said premises, the selection of substandard materials with which to build said premises, or both."

The matter proceeded to trial before a jury. Following the presentation of the Buyers' case, the Vendors moved for a non-suit in favor of Vendors Richard and Patricia Resta, jointly, and alternatively, for a non-suit in favor of Vendor Patricia Resta, singly. Both motions for non-suit were denied.

At the conclusion of the trial the Vendors filed a motion for a directed verdict which the court denied. The jury then rendered a verdict for the Buyers in the amount of $6,750. Pursuant to Pa.R.C.P. No. 227.1, the Vendors filed timely post-trial motions seeking a judgment n.o.v. or a new trial. Subsequently, the Vendors' motions were denied after a hearing and a rehearing at which the Vendors were represented by new counsel.

On appeal the Vendors contend (1) that the implied warranties of habitability and reasonable workmanship were excluded by the terms of the parties' contract of sale; (2) that the Buyers' witness was not properly qualified as an expert; (3) that the testimony of the Buyers' witness constituted hearsay; (4) that the proof of damages was insufficiently exact to prevent jury speculation; (5) that the trial court incorrectly charged the jury as to the measure of damages, and (6) that the trial court improperly instructed the jury as to the liability of Vendor Patricia Resta and wrongly molded the verdict against said Vendor. We shall address these contentions seriatim.

■ Our scope of review in such cases is well settled. In reviewing a motion for a judgment n.o.v., we must consider the evidence most favorable to the verdict winner and all reasonable inferences therefrom. *Ditz v. Marshall*, 259 Pa.Super.Ct. 31, 35, 393 A.2d 701, 703 (1978). "A judgment n.o.v. should be entered only in a clear case, and any doubts should be resolved in favor of the verdict." *Atkins v.*

*Urban Redevelopment Authority of Pittsburgh*, 489 Pa. 344, 351, 414 A.2d 100, 103 (1980).

In reviewing a motion for a new trial, we must consider all the evidence adduced at the trial to ascertain whether the verdict was manifestly against the weight of the evidence. *Ditz*, 259 Pa.Super. at 35, 393 A.2d at 703. "[T]he decision to either grant or deny a motion for new trial is within the sound discretion of the trial court and will be reversed on appeal only if the appellate court determines the trial court palpably abused its discretion," *Myers v. Gold*, 277 Pa.Super.Ct. 66, 69, 419 A.2d 663, 664 (1980), or committed "a clear error of law." *Eldridge v. Melcher*, 226 Pa.Super.Ct. 381, 387, 313 A.2d 750, 754 (1973), *allocatur denied.*

## I. Implied Warranties

In *Elderkin v. Gaster*, 447 Pa. 118, 288 A.2d 771 (1972), Pennsylvania numbered among the first jurisdictions acknowledging an implied warranty of habitability, as well as an implied warranty of reasonable workmanship, in contracts whereby builder-vendors sold newly constructed houses.[2] We are now asked to decide whether in selling new homes builder-vendors can limit or disclaim the implied warranties.

Compared to the ordinary home purchaser, the builder-vendor possesses "superior knowledge and expertise in all aspects of building, including its legal aspects." *Contractor Industries v. Zerr*, 241 Pa.Super.Ct. 92, 106, 359 A.2d 803, 810 (1976) (Cercone, J., dissenting). "In the vast majority of cases the vendor ... enjoys superior bargaining position .... Standard form contracts are generally utilized and '[e]xpress warranties are rarely given, expensive, and impractical for most buyers to negotiate. Inevitably the buyer is forced to rely on the skills of the seller.' "

2. For a list of jurisdictions using either an implied warranty or a strict liability theory to protect the purchasers of new homes, see *Redarowicz v. Ohlendorf*, 92 Ill.2d 171, 65 Ill.Dec. 411, 441 N.E.2d 324 (1982).

*McDonald v. Mianecki,* 79 N.J. 275, 398 A.2d 1283, 1290 (1979) (citation omitted).

In *Elderkin* the Pennsylvania Supreme Court recognized that the implied warranties of habitability and reasonable workmanship were necessary to equalize the disparate positions of the builder-vendor and the average home purchaser by safeguarding the reasonable expectations of the purchaser compelled to depend upon the builder-vendor's greater manufacturing and marketing expertise.

> [O]ne who purchases a development home ... justifiably relies on the skill of the developer that the house will be a suitable living unit. Not only does a housing developer hold himself out as having the necessary expertise with which to produce an adequate dwelling, but he has by far the better opportunity to examine the suitability of the home site and to determine what measures should be taken to provide a home fit for habitation. As between the builder-vendor and the vendee, the position of the former, even though he exercises reasonable care, dictates that he bear the risk that a home which he has built will be functional and habitable in accordance with contemporary community standards .... [T]he builder-vendor impliedly warrants that the home he has built and is selling is constructed in a reasonably workmanlike manner and that it is fit for the purposes intended—habitation.
>
> ... [S]election and subdivision of the home sites are within the exclusive domain of the builder-vendors. The developer holds himself out, not only as a construction expert, but as one qualified to know what sorts of lots are suitable for the types of home to be constructed. Of the two parties to the transaction, the builder-vendor is manifestly in a better position than the normal vendee to guard against defects in the home site and if necessary to protect himself against potential but unknown defects in the projected home site.

*Id.* 447 Pa. at 128–30, 288 A.2d at 776–77; *accord, Park v. Sohn,* 89 Ill.2d 453, 60 Ill.Dec. 609, 433 N.E.2d 651 (1982); *Casavant v. Campopiano,* 114 R.I. 24, 327 A.2d 831 (1974).[3]

■ Thus, given the important consumer protection afforded by the implied warranties, we hold that such warranties may be limited or disclaimed only by clear and unambiguous language in a written contract between the builder-vendor and the home purchaser. *Sloat v. Matheny,* Colo., 625 P.2d 1031 (1981); *accord, G–W–L, Inc. v. Robichaux,* 643 S.W.2d 392 (Tex.1982); *Griffin v. Wheeler-Leonard & Co.,* 290 N.C. 185, 225 S.E.2d 557 (1976); *Casavant; Hesson v. Walmsley Construction Co.,* 422 So.2d 943 (Fla.App. 1982); *Arnold v. New City Condominiums Corp.,* 78 App. Div.2d 882, 433 N.Y.2d 196 (1980), *appeal dismissed,* 53 N.Y.2d 823, 422 N.E.2d 582, 439 N.Y.2d 922 (1980); *Herlihy v. Dunbar Builders Corp.,* 92 Ill.App.3d 310, 47 Ill.Dec. 911, 415 N.E.2d 1224 (1980); Note, *Elderkin v. Gaster— The Pennsylvania Experience with Implied Warranties in Sales of New Homes,* 47 Temple L.Q. 172 (1973).

Furthermore, since "the language of a contract must be construed strictly against the party responsible for it [and since] ... [t]his general principle is even more forcefully applied when the contract is reduced to writing by a party possessing special knowledge with respect to the subject matter," *Zerr,* 241 Pa.Super. at 107, 359 A.2d at 810 (Cercone, J., dissenting), we additionally hold that the contractual language purportedly creating an express restriction or exclusion of an implied warranty must be strictly construed against the builder-vendor. *Sloat; accord, Herlihy; see*

3. The implied warranties also comport with changes in the concept and intent of property ownership.

> In the early days of the common law, the main concern of the parties was the land, and whatever structures were on it could be easily repaired by the new landholder. Today, the purpose is to buy a dwelling, rather than land per se, and most purchasers are not equipped to undertake major repairs.... [Thus,] it seems only fair to put the burden of repairing defects in construction on the person who is (1) responsible for the defects, (2) is in a position to repair them and (3) is in a position to spread the costs of the repair. This is especially true since a significant amount of the defects can be so buried in the construction that it could be impossible to find them before buying, no matter how careful or thorough the inspection. *Conyers v. Molloy,* 50 Ill.App.3d 17, 19, 7 Ill.Dec. 695, 697, 364 N.E.2d 986, 988 (1977).

*generally Zimmer v. Mitchel and Ness,* 253 Pa.Super.Ct. 474, 385 A.2d 437 (1978), *aff'd,* 490 Pa. 428, 416 A.2d 1010 (1980).

To create clear and unambiguous language of disclaimer, the parties' contract must contain language which is both understandable and sufficiently *particular* to provide the new home purchaser adequate notice of the implied warranty protections that he is waiving by signing the contract. *G–W–L, Inc.; accord, Casavant; Herlihy; Sallinger v. Mayer,* 304 So.2d 730 (La.App.1974); *see generally Zimmer.* To supply proper notice, language of disclaimer must refer to its effect on specifically designated, potential latent defects. *See* discussion of latent defects, *infra.* Evidence that the purchaser and the builder-vendor actually negotiated the waiver language in the parties' contract will tend to indicate that the purchaser was aware of the contract's waiver language and its import and accordingly, will tend to substantiate a valid waiver. *See Herlihy; Conyers; accord, Sallinger.*

In the present case paragraph thirteen of the Vendors' contract with the Buyers states that the

Buyer has inspected the property or hereby waives the right to do so and he has agreed to purchase it as a result of such inspection and not because of or in reliance upon any representation made by the Seller ... and that he has agreed to purchase it in its present condition unless otherwise specified herein. It is further understood that this agreement contains the whole agreement between the Seller and the Buyer and there are no other terms, obligations, covenants, representations, statements or conditions, oral or otherwise of any kind whatsoever concerning this sale.

The Vendors argue that paragraph thirteen of the parties' contract "negate[s] any and all warranties." We do not agree and shall proceed to analyze each of the component clauses of paragraph thirteen.

■ The inspection clause introducing paragraph thirteen refutes the existence of Vendors' representations as to defects which would be apparent to the Buyers upon a reasonable inspection of the property being sold. *See LeDonne v. Kessler*, 256 Pa.Super.Ct. 280, 389 A.2d 1123 (1978); *Griffin; see also Quashnock v. Frost*, 299 Pa.Super.Ct. 9, 445 A.2d 121 (1982); *Glanski v. Ervine*, 269 Pa.Super.Ct. 182, 409 A.2d 425 (1979). However, the warranties of habitability and reasonable workmanship are not created by representations of a builder-vendor but rather are implied in law and as such, exist independently of any representations of a builder-vendor. *Griffin.*

■ Moreover, the implied warranties of a builder-vendor do not "extend to defects of which the purchaser had actual notice or which are or should be visible to a reasonably prudent man upon an inspection of the dwelling." [4] *Griffin*, 290 N.C. at 200, 225 S.E.2d at 567; *accord, Herlihy; see Raab v. Beatty*, 96 Pa.Super.Ct. 574 (1929); *Stewart v. Trimble*, 15 Pa.Super.Ct. 513 (1901); *Hermes v. Staiano*, 181 N.J.Super. 424, 437 A.2d 925 (1981); *Duncan v. Schuster-Graham Homes, Inc.*, 194 Colo. 441, 578 P.2d 637 (1978); *Casavant; Wawak v. Stewart*, 247 Ark. 1093, 449 S.W.2d 922 (1970); *see also Quashnock; LeDonne; Elfant v. Clauss*, 197 Pa.Super.Ct. 201, 177 A.2d 153 (1962).

■ A reasonable pre-purchase inspection requires examination of the premises by the intended purchaser—not by an expert. Defects which would not be apparent to an ordinary purchaser as a result of a reasonable inspection constitute latent defects covered by the implied warranties. *Raab; Trimble; accord, Park; Sallinger; Casavant; Wawak; see also Quashnock; LeDonne.*

4. In *LeDonne v. Kessler*, 256 Pa.Super.Ct. 280, 389 A.2d 1123 (1978), "appellants' inspection of the premises revealed the very problem which they [protested on appeal]: water leakage in the sundeck and cellar." *Id.*, 256 Pa.Superior Ct. at 293, 389 A.2d at 1130. Consequently, we stated that "[a]t the time of executing the agreement of sale, appellants had every reason to insist upon contractual protection against this readily discernible threat." *Id.*, 256 Pa.Superior Ct. at 293, 389 A.2d at 1130.

▆▆ Furthermore, a reasonable inspection does not necessitate " 'a minute inspection of every nook and cranny.' " *Abrams, Inc. v. Wolkov*, 371 Pa. 44, 47, 89 A.2d 359, 361 (1952); *Quashnock; see LeDonne; Elfant.* To the contrary, the requisites of a reasonable inspection vary with the circumstances of the individual case. In *Quashnock*, for example, this Court held that "a 'reasonable inspection' of [a] house by prospective buyers would not require investigation of the crawl space beneath the house in question since the crawl space lacked lighting and had an entry measuring only one foot by two feet. *Id.* 299 Pa.Super. at 22, 445 A.2d at 127. Similarly, in *LeDonne* we excused the purchasers' non-examination of a septic system which was underground and hence, virtually inaccessible. *Accord, Sallinger* (purchaser not expected to climb onto roof to evaluate soundness of roof structure when purchaser's view of roof was obscured by trees); *Casavant* (reasonable inspection did not mandate investigation of roof construction where there was no access to the open space under the roof).

In the case sub judice the Buyers principally complained of pervasive dampness in their newly built home which caused mold and mildew throughout the house and produced a constant malodor. Record at 40–44. The expert witness whom the Buyers retained in preparation for the trial of this case,[5] testified that the excessive moisture inside the Buyers' house resulted from an improper crawl space drainage system underneath the house. Record at 143–44, 148, 150.

Consequently, our inquiry becomes whether a reasonable pre-purchase inspection of the house by the Buyers should have included the Buyers' exploration of the crawl space under the house. At trial the Buyers' expert gave the following description of the crawl space beneath the Buyers' home: "It is about between thirty and thirty-six inches

5. The Buyers' complaint in assumpsit was filed on May 12, 1978. The Buyers' expert witness first examined the house in the summer of 1979 and again inspected the house in October of 1979.

high. You drop in through a little opening about three by four onto a little landing area; then you go underneath the foundation, and it is basically leveled gravel." Record at 143.

■ Based upon the described physical impediments to investigating the subject crawl space, we conclude that here, as in *Quashnock*, a reasonable pre-purchase house inspection did not require the Buyers to examine the crawl space below the house. Therefore, although the Buyers had leased the house for several months,[6] on the house purchase date the inadequate crawl space drainage system remained a condition undiscerned by the Buyers, *i.e.*, a latent defect encompassed by the implied warranties.[7]

Consequently, because the implied warranties do not arise from representations of a builder-vendor and because the implied warranties pertain only to latent defects, the inspection clause in paragraph thirteen of the parties' contract does not effectively disclaim the warranties of habitability and reasonable workmanship.

■ The "present condition" provision of paragraph thirteen fails to refer specifically to its potential impact on the

6. In *Stewart v. Trimble*, 15 Pa.Super.Ct. 513 (1901), a builder-vendor argued that a home purchaser was estopped from alleging poor workmanship and the use of substandard building materials in constructing his newly built home because before raising the allegations, the purchaser had resided in the home for several weeks. However, this Court observed that "the character of the defects [in the house] was such as not to be visible ... [and accordingly maintained that] defects which were not manifest ... when the due bill was given, were not waived as to their effect by the giving of the due bill." *Id.* at 519; *Raab v. Beatty*, 96 Pa.Super.Ct. 574 (1929); *accord, Park v. Sohn*, 89 Ill.2d 453, 60 Ill.Dec. 609, 433 N.E.2d 651 (1982); *Griffin v. Wheeler-Leonard & Co.*, 290 N.C. 185, 225 S.E.2d 557 (1976); *Sallinger v. Mayer*, 304 So.2d 730 (La.App.1974); *see LeDonne v. Kessler*, 256 Pa.Super.Ct. 280, 389 A.2d 1123 (1978).

7. The Buyers were not apprised of the crawl space drainage problem and its resultant structural debilitation of the house (rotting floor boards under the house, Record at 151) until they hired an expert witness in preparation for the trial of the present case. See Record at 143–44 and 277 outlining difficulty in detecting standing water in crawl space as explained by Buyers' expert and Vendor Richard Resta, respectively.

implied warranties. Accordingly, while the "present condition" language alerts alerts the Buyers to observe patent defects in the premises they wish to purchase, the "present condition" language does not adequately apprise the Buyers of their duty to ascertain latent defects normally covered by the implied warranties. *Casavant; Sallinger; see also Glanski.* Thus, the "present condition" provision of paragraph thirteen does not circumscribe the implied warranties.

■ The final segment of paragraph thirteen consists of an integration clause which declares that the parties' written contract embodies "the whole agreement between the Seller and the Buyer and [that] there are no other terms, obligations, covenants, representations, statements or conditions, oral or otherwise of any kind whatsoever concerning this sale." Thus, the integration clause of paragraph thirteen

> may be regarded as sufficient to exclude a matter which one of the parties might contend was *in fact* agreed to prior to the signing of the contract .... [S]tanding alone, these words are not sufficient to exclude an *implied warranty*, which is applicable only by operation of law. Such an exclusion, if desired by the parties to a contract for the purchase of a residence, should be accompanied by clear, unambiguous language, reflecting the fact that the parties fully intended such result.

*Griffin,* 290 N.C. at 202, 225 S.E.2d at 568 (emphasis in original). That is, the integration clause of paragraph thirteen does not constitute a valid limitation of the implied warranties because it fails to explain with particularity its purported effect on implied warranties.

Therefore, we hold that when the alleged disclaimer of implied warranties in paragraph thirteen of the parties' contract is strictly construed against the Vendors, the alleged disclaimer fails because it does not refer to its impact on specific, potential latent defects and so does not notify the Buyers of the implied warranty protection they are waiving by signing the contract supplied by the Vendors.

## II. Buyers' Expert Witness

Next, the Vendors contend that the Buyers' witness was not properly qualified as an expert in the construction of houses having a crawl space and should not have been permitted to testify about the allegedly defective design of the crawl space drainage system and the cost of correcting the design.

"The Pennsylvania standard of qualification for an expert witness is a liberal one." *Rutter v. Northeastern Beaver County School District*, 496 Pa. 590, 597–98, 437 A.2d 1198, 1201 (1981). " 'If a witness has any reasonable pretension to specialized knowledge on the subject under investigation he or she is qualified as an expert.' " *Morris v. Moss*, 290 Pa.Super.Ct. 587, 591, 435 A.2d 184, 186 (citation omitted). "Such a person need not 'possess all the knowledge in his special field of activity in order to qualify.' " *Pratt v. Stein, M.D.*, 298 Pa.Super.Ct. 92, 153, 444 A.2d 674, 706 (1982) (citation omitted); *Whistler Sportswear, Inc. v. Rullo*, 289 Pa.Super.Ct. 230, 433 A.2d 40 (1981).

"[T]he question of the qualifications of an expert witness is one for the discretion of the trial court." *Morris*, 290 Pa.Super. at 591, 435 A.2d at 186. A trial court "will be reversed only for a clear case of error." *Pratt*, 298 Pa.Super. at 152, 444 A.2d at 706.

In its written opinion the trial court gave the following excellent summarization of the qualifications of the Buyers' expert witness:

The [Buyers'] witness, Mr. Hopkins, had studied mechanical and structural engineering for two years at the university level. After his education, he was employed for approximately three years [by] ... a firm which did structural design work and field corrections. He was subsequently employed for two years ... as a facility engineer ... in charge of plant repairs and alterations. In 1973, Mr. Hopkins began building houses, and at the time of trial was president of a building corporation.... He was a past president of the Beaver County Home

Builders, and a member of the Metropolitan Pittsburgh Home Builders, both of which are associations dealing with home building.

Mr. Hopkins testified that he had overseen practically every one of the one hundred and fifty foundation installations that his firm ... had performed since 1973. He also testified that [his firm] was primarily involved in single-family residence work, although the firm did take on some apartment and remodeling work. Although only two of the one hundred and fifty foundations Mr. Hopkins oversaw on behalf of his firm involved crawl spaces similar to that installed by [the Vendors] in the home sold to the [Buyers], Mr. Hopkins was of the opinion that the construction concept for a crawl space was not measurably different from that employed when constructing a full basement. The purpose of both a crawl space and a full basement, in his view, was to provide an air void between the floor and the ground. Therefore, the only difference between the two as far as he was concerned was in the cost of installation, with the crawl space being the less expensive of the two.

Trial Court Opinion at pp. 5–6.

■■■ Our independent review of the record has confirmed that the trial court accurately outlined the specialized training and extensive experience of the Buyers' witness. Record at 122–29. Therefore, we hold that the trial court did not abuse its discretion in permitting the Buyers' witness to testify as an expert.

### III. Hearsay

■■■ In addition, the Vendors argue that even if the Buyers' witness was properly qualified as an expert, the witness's testimony regarding repair costs should have been excluded as hearsay.

The Vendors' argument derives from the witness's use of repair cost estimates which were prepared principally by the witness's business associate who did not testify at trial

and was thus not subject to cross-examination by the Vendors.

However, the record reveals that counsel for the Vendors knew that the Buyers' witness was testifying on direct examination from a document which the witness had not prepared himself. Record at 170, 189. Nevertheless, the Vendors' counsel did not object at trial to the possible hearsay nature of the witness's testimony. At the close of the Vendors' cross-examination of the Buyers' expert, counsel for the Buyers offered into evidence the estimate sheet from which the Buyers' expert had testified during direct examination. The estimate document was admitted into evidence without objection by the Vendors but with certain deletions to which the Buyers and the Vendors agreed on the record. Record at 229–31.

In this appeal the Vendors have raised a hearsay objection for the first time.[8] Pursuant to Pa.R.A.P. 302, "[i]ssues not raised in the lower court are waived and cannot be raised for the first time on appeal." *Commonwealth v. Piper,* 458 Pa. 307, 328 A.2d 845 (1974); *Roque v. Nationwide Insurance Co.,* 292 Pa.Super.Ct. 117, 436 A.2d 1033 (1981). Consequently, we cannot consider the Vendors' claim of error.

### IV. Proof of Damages

 The Vendors additionally assert that the Buyers' proof of damages was too inexact to prevent jury speculation.

The legal principles concerning proof of damages were summarized in *Gordon v. Trovato,* 234 Pa.Super.Ct. 279, 282–86, 338 A.2d 653, 654–57 (1975):

> The plaintiff has the duty and the burden to establish by proper testimony the damages which he claims to have sustained, and if he fails to meet this burden, the question of damages cannot be submitted to the jury.... The amount and items of pecuniary damage cannot be pre-

---

8. Neither our review of the record nor the Vendors' appellate brief indicates an attempt by the Vendors to assert a hearsay claims before the trial court. *See* Pa.R.A.P. 2117(c) and Pa.R.A.P. 2119(e).

sumed but must be proved by the establishment of facts
.... It is the burden of the plaintiff to establish by
evidence such facts as will furnish a basis for the legal
assessment of damages according to some definite and
legal rule.

....

The law requires not merely conjecture, but rather
sufficient data from which the damages can be assessed
with reasonable certainty.

*Accord, Pratt; Department of Transportation v. Acchione and Canuso, Inc.*, 55 Pa.Commw.Ct. 65, 423 A.2d 30
(1980). "While it is true that mere uncertainty as to the
amount of damages will not preclude recovery, *Pugh v.
Holmes*, 486 Pa. 272, 405 A.2d 897 (1979), it is also clear
that the jury must have an intelligent understanding of how
damages should be calculated." *Mason v. Western Pennsylvania Hospital*, 286 Pa.Super.Ct. 354, 382, 428 A.2d
1366, 1380 (1981) (Hester, J., concurring and dissenting).

The testimony of the Buyers' expert witness regarding
the type and cost of repairs necessary to make the Buyers'
house habitable occupies thirteen pages of the record on
direct examination and approximately forty-seven pages of
the record on cross-examination. Illustrative of the detail
provided by the Buyers' expert is this excerpt from the
expert's answers on direct examination concerning the installation of a French drain to remove water from the crawl
space beneath the Buyers' home:

Buyers' Expert Witness: [The installation of a French
drain] is going to require digging a ditch from the front
of the house out to the street and installing pipe in that
ditch and running the water away from the house;
approximately two hundred feet of pipe, miscellaneous
fittings; have to install some more gravel and bring the
layer of gravel up, and also the labor to do so because
there it is a very difficult job because you can't stand
up [in the crawl space]—it is working on hands and
knees. We estimate the total cost, $2,268.

Counsel for the Buyers: Break it [the cost] down?

> Buyers' Expert Witness: The backhoe we estimated $240; the two hundred feet of pipe is estimated at $1.50 a foot, or $300; miscellaneous fittings, $25; the gravel, $400; plastic, which is your vapor barrier, is one hundred and fifty; and labor is eleven hundred and fifty-three.

Record at 156.

Consequently, we hold that the testimony of the Buyers' witness gave the jury "an intelligent understanding" of the items to consider including in the award of damages plus a basis for computing the amount of damages to award. "We have never held that damages that are not capable of *exact ascertainment* are for that reason not recoverable.... Our law only requires that a reasonable quantity of information must be supplied by plaintiff so that the jury may fairly estimate the amount of damages from the evidence." *Ashcraft v. C.G. Hussey and Co.*, 359 Pa. 129, 132–33, 58 A.2d 170, 172 (1948) (emphasis in original); *Defulvio v. Holst, M.D.*, 272 Pa.Super.Ct. 221, 414 A.2d 1087 (1979). As the trial court observed, the Buyers' expert

> testified extensively with respect to the cost of the repairs he felt were necessary to correct the defects which [the Buyers] alleged. The [Vendors'] own expert witnesses likewise testified as to the cost of the repairs they felt were necessary to correct any alleged defects in the [Buyers'] property. Therefore, the jury was presented with more than mere conjecture from which to arrive at a damage sum. Although the [Vendors] may disagree with the method in which the [Buyers] proposed to rectify the damage they allegedly suffered and the amount of money needed to so rectify, that does not mean that the [Buyers] did not document in the evidence the damages they averred they suffered.

Trial Court Opinion at p. 9.

### V. Measure of Damages

The Vendors further contend that the trial court incorrectly charged the jury as to the measure of damages by explaining that "[d]amages, where the property is not a

total loss, ... are measured by the difference in value before and after the harm suffered, and in this case it would be the reasonable costs of repairs ...." Record at 484.[9]

Again, as with their hearsay contention, the Vendors have failed to raise this issue initially before the trial court, but rather, have argued this point for the first time on appeal. In *Dilliplaine v. Lehigh Valley Trust Co.*, 457 Pa. 255, 322 A.2d 114 (1974), the Pennsylvania Supreme Court stated that an issue is preserved for appeal only where a timely specific exception to jury instructions has been taken in the trial court. "Requiring a timely specific objection to be taken in the trial court will ensure that the trial judge has a chance to correct alleged trial errors. This opportunity to correct alleged errors at trial advances the orderly and efficient use of court judicial resources." *Id.*, 457 Pa. at 258–59, 322 A.2d at 116; *Crosbie v. Westinghouse Elevator Co.*, 297 Pa.Super.Ct. 304, 443 A.2d 849 (1982).

In the present case, after the trial judge had charged the jury, the judge queried whether there were "any amendments, corrections, or additions to the Charge." Record at 493. The Vendors did not question the trial court's instructions on formulating damages. Consequently, the Vendors have waived objections to the jury instructions regarding the measure of damages. *Dilliplaine.*

## VI. Verdict Against Vendor Patricia Resta

 Finally, the Vendors contend that the trial court improperly instructed the jury as to the liability of Vendor Patricia Resta and wrongly molded the verdict against her.

---

**9.** In *Gadbois v. Leb-Co Builders, Inc.*, 312 Pa.Super.Ct. 144, 458 A.2d 555 (1983), this Court recently held

> that the measure of damages in cases where a homeowner sues for defective construction is the difference between the market value that the house would have had if constructed as promised, with the qualification that if it is reasonably practical to cure the defects in construction by repairs, and if the cost of repairs does not exceed the difference in market value, then the measure of damages is the cost of repairs.

*Id.*, 312 Pa.Superior Ct. at 152, 458 A.2d at 559; *accord, Park v. Sohn*, 89 Ill.2d 453, 60 Ill.Dec. 609, 433 N.E.2d 651 (1982); *see also Griffin v. Wheeler-Leonard & Co.*, 290 N.C. 185, 225 S.E.2d 557 (1976).

In its written opinion the trial court reviewed the evidence of record establishing Vendor Patricia Resta's association with, and participation in, the construction business of her husband, Vendor Richard Resta:

> Evidence that was not contradicted shows that Patricia Resta was involved in the construction and conveyance of the [Buyers'] property in the following respects: Along with her husband, she purchased the vacant lot upon which the residence was to be constructed and then sold. She helped financially by signing a construction mortgage on the property to provide construction money. She also aided in financing the purchase of building materials for the house by signing an open-ended joint note with a building supplier. She answered business calls on their home phone and conveyed messages to her husband. She joined as a seller in executing and delivering the deed for the completed property to the purchasers. She shared one-half the proceeds from the sale since the proceeds were deposited in a joint bank account owned by Patricia Resta and her husband.

Trial Court Opinion at pp. 12–13.[10] Record at 231–33, 415–16.

Although the question is close, based on the evidence of Vendor Patricia Resta's involvement, we cannot say that the trial court erred in its determination that Patricia Resta conforms to the *Elderkin* definition of a builder-vendor [11] and thus was properly a party upon whom the jury could impose liability.

Having ascertained that Patricia Resta could be classified as a builder-vendor, the trial court instructed the jury that as far as Mr. and Mrs. Resta [were] concerned, . . . . if [the jury found] as a fact that they were both owners of the property, and if [the jury] further [found] that a new

---

**10.** Vendor Patricia Resta testified that she and her husband did not have a separate business telephone but used their home telephone for receiving and placing both business and personal calls. Record at 415–16.

**11.** See footnote 1, *supra.*

home was built on the property, then [the jury] would find that both Mr. and Mrs. Resta [were] bound by [the] implied warranties [of habitability and reasonable workmanship].

Record at 479.

The court later explained that if the jury found that Vendors Patricia and Richard Resta

did not breach either the implied warranty of reasonable workmanship or the implied warranty that the house was habitable, then ... [the jury's] verdict would be for the [Vendors]. However, if [the jury found] that the [Vendors] did breach either one or both of the implied warranties ... and if [the jury] further [found] such a breach of warranty was the legal cause of certain damage to the [Buyers'] property, [the jury] would then be justified in returning a verdict in favor of the [Buyers] against the [Vendors], and then ... would come to the question of damages.

Record at 484.

The jury returned a verdict "in favor of the [Buyers], Nelson G. Tyus and Frances A. Tyus" for the sum of $6,750 but failed to express against whom their verdict was lodged. Record at 500. Consequently, after having read aloud the jury's verdict, the trial judge stated:

Now, members of the jury, if I would understand your verdict, that you find in favor of the [Buyers] to be awarded the sum of $6,750 against the [Vendors], Richard Resta and Patricia Resta—is that your verdict? I have added that as being what would naturally follow from that. So, in such matters as this, it is appropriate for the Court to mold the verdict in accordance with your decision. Now, you have decided in favor of the [Buyers] the sum of $6,750, and it would naturally follow that it would be against the [Vendors], Richard Resta and Patricia Resta. Is that the verdict of the jury?

Record at 500.

The Vendors argue that it was inappropriate for the court to mold the verdict against Vendor Patricia Resta.

It is well settled that a trial court in this Commonwealth has the power to mold a jury's verdict to conform to the clear intent of the jury .... Verdicts which are not technically correct in form but which manifest a clear intent on the part of the jury may be corrected without resort to further jury deliberations or the grant of a new trial.

. . . .

Stated more simply, the power to mold or more precisely amend a jury's verdict is merely a power to "make the record accord with the facts, or to cause the verdict to speak the truth...."

*House of Pasta, Inc. v. Mayo,* 303 Pa.Super.Ct. 298, 307–08, 449 A.2d 697, 701–02 (1982) (citation omitted).

▮ Thus, the underlying issue is whether the jury's intent was sufficiently clear to permit the judge to rephrase the verdict to represent accurately the jury's true intention.

Here, the trial judge asked on the record whether there was "any question in the minds of the attorneys for either side as to what the jury's intention [was] ..." Record at 500. The Vendors' counsel requested that the jury be polled. Each of the twelve jurors was polled and responded unequivocally that the verdict was for Mr. and Mrs. Tyus and against Mr. and Mrs. Resta. Record at 501–03.

Therefore, given the trial court's explicit jury charges and the jurors' answers to the poll, we hold that the jury's intent was sufficiently clear to empower the trial court to mold the jury's verdict and that the court's molding of the verdict accurately reflected the jury's intent.

Accordingly, we affirm the order of the Court of Common Pleas of Beaver County.

HESTER, J., concurred in the result.