J-A13012-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| BEAUMONT CONDOMINIUM ASSOCIATION | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| JEFFREY M. BROWN ASSOCIATES, INC., CARSON CONCRETE, CORP., BEAUMONT CORP., MONTIVUE CONSTRUCTION AND PENNONI ASSOC., INC. | |
| APPEAL OF: JEFFREY M. BROWN ASSOCIATES, INC. | |
| | No. 2177 EDA 2016 |

Appeal from the Judgment Entered September 9, 2016
In the Court of Common Pleas of Philadelphia County
Civil Division at No(s): 1896, January Term, 2014

\*\*\*\*\*

| | |
|---|---|
| JEFFREY M. BROWN ASSOCIATES, INC. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| CARSON CONCRETE CORPORATION | |
| Appellee | No. 2181 EDA 2016 |

Appeal from the Order Entered June 7, 2016
In the Court of Common Pleas of Philadelphia County
Civil Division at No(s): 02440, December Term, 2013

J-A13012-17

BEFORE: LAZARUS, J., OTT, J., and FITZGERALD, J.[*]

MEMORANDUM BY LAZARUS, J.:                    **FILED NOVEMBER 03, 2017**

In these consolidated[1] appeals (2177 EDA 2016[2] and 2181 EDA 2016[3]) Jeffrey M. Brown Associates, Inc. (JMB) appeals from the trial court's order granting in part and denying in part its motion for post-trial relief, granting Appellee Carson Concrete Corporation's (Carson) post-trial motion, and striking an award of $62,510.73 in favor of JMB, and from the court's final judgment entered in favor of Carson and against JMB. After careful review, we are constrained to affirm.

Beaumont Corporation (Owner) and Montvue Construction, Inc. (Builder)[4] hired JMB as a construction manager for a project (the "Project") at Beaumont Condominiums, a 13-story condominium complex (the "Building") located on South Front Street in Philadelphia. Accordingly, Builder executed a "Standard Form of Agreement Between Owner and Construction Manager" on June 30, 2003. On March 22, 2004, JMB hired

_____

[*] Former Justice specially assigned to the Superior Court.

[1] On January 17, 2017, our Court entered an order granting JMB's application to consolidate the two cases, 2177 EDA 2016 and 2181 EDA 2016, as they involve related issues and parties. ***See*** Pa.R.A.P. 512.

[2] Beaumont Condominium Association lawsuit ("Association Action").

[3] Referred to as "JMB lawsuit."

[4] Owner hired Montvue to erect the Building and appurtenances on the subject property. ***See*** Beaumont Condominium Association's Complaint, 2/3/14, at ¶ 8.

- 2 -

Carson,[5] for $1.8 million, as a subcontractor[6] to design and build the entire concrete superstructure for the Project using a structural system known as "post-tension" concrete.  With this type of tension system, structural support

_____

[5] The parties entered into a "Design Build Subcontract" to memorialize this agreement.

[6] In **Turner Construction, Inc. v. American States Ins. Co.**, 579 A.2d 915 (Pa. Super. 1990), our Court explained the nature of this type of relationship:

> Typically when major construction is involved an owner has neither the desire nor the ability to negotiate with and supervise the multitude of trades and skills required to complete a project. Consequently an owner will engage a general contractor. The general contractor will retain, coordinate and supervise subcontractors. The owner looks to the general contractor, not the subcontractors, both for performance of the total construction project and for any damages or other relief if there is a default in performance. Performance and the payment of damages are normally assured by the bond of a surety on which the general contractor is principal and the owner is the obligee.
>
> The general contractor, in turn, who is responsible for the performance of the subcontractors, has a right of action against any subcontractor which defaults. Performance and payment of damages by a subcontractor are normally assured by the bond of a surety on which the subcontractor is principal and the general contractor is the obligee.
>
> Thus the typical owner is insulated from the subcontractors both during the course of construction and during the pursuit of remedies in the event of a default. Conversely, the subcontractors are insulated from the owner. The owner deals with and, if necessary, sues the general contractor, and the general contractor deals with and, if necessary, sues the subcontractor.

**Id.** at 918 n.2, citing **Pierce Associates, Inc. v. Neumours Foundation**, 865 F.2d 530, 535-36 (3rd Cir.1989).

- 3 -

for the building is provided by reinforced concrete, with unstressed steel cables embedded within the concrete floor slabs, which are then tensioned after the concrete is poured. With post-tensioning, the cables are generally pulled or tensioned a few days after the concrete is poured. The design for Carson's post-tension system included, in part, the use of certain U-shaped pieces of steel rebar called "hairpins" to reinforce and confine the cables in locations where the cables had to bend, or "sweep," within the concrete.

In April 2004, Owner hired an engineering firm, Pennoni Associates ("Pennoni"), to perform testing and inspection services during the construction process. On July 6, 2004, Pennoni inspected the reinforcing steel and post-tensioning for the 10th floor of the condominium complex and reported that "[h]airpins were placed @ sweeps as designed." Def.'s Ex. 4. Shortly thereafter, the concrete for the 10th floor was poured. The Project was completed in 2005.

Around New Year's Day 2013, a post-tensioned cable in the concrete floor of the 10th floor unit of the condominium complex lost its tension and ripped out of the concrete floor, causing damage to the unit owned by the Bergamo Trust ("the Trust") as well as compromising the structural integrity of the Building. Specifically, the blowout dislodged hardwood flooring and a toilet in the 10th floor unit. JMB was immediately notified of the incident; it sent personnel to investigate the damage.

At trial, JBM presented an expert who testified that a number of hairpins, which were included in the original Project drawings, were missing

- 4 -

at the location where the blowout occurred. The expert further opined that "the lack of hairpins in this section of the tendon that was curving directly led to the failure of the concrete in this area[,] because the hairpins serve to restrain the tendons from moving the exact direction that they did[,]" and that had the hairpins been present the cables "would not have been able to pull out of the concrete and move in that direction." N.T. Non-Jury Trial, 2/1/16, at 151-52. While JMB's expert agreed with Carson's expert that the 68-mile per hour winds from Hurricane Sandy[7] could have affected the structure, he did not think that the damage would have occurred if the hairpins had been in place. *Id.* at 152 ("[H]ad the hairpins been present, the failure would not have happened.").

The Beaumont Condominiums Association (Association), the unit owners' association of the Beaumont Condominiums, engaged an expert from a post-tension firm to design and implement a remediation plan. Ultimately, the Association expended approximately $180,000 to investigate the blowout, repair the structural defect, and repair the physical damage to the Trust's condominium unit.

---

[7] Hurricane Sandy became a Category 1 hurricane that made landfall in the Unites States about 8 p.m. EDT on October 29, 2014, near Atlantic City, NJ, with winds as strong as 80 miles per hour. *See* www.livescience.com/24380-hurricane-sandy-status-data.html (last visited 7/7/17).

Despite the Association's demands to be reimbursed for the repair costs, Carson refused to resolve the matter. As a result, in December 2013 JMB instituted a lawsuit ("JMB lawsuit"), sounding in breach of contract, negligence, and contractual indemnification, against Carson. In January 2014, the Association ("Association Action") commenced an action against various defendants, pursuant to the Pennsylvania Uniform Condominium Act (PUCA),[8] including JMB, Carson, the original condominium sponsors, and Pennoni seeking reimbursement of the costs incurred as a result of the blowout. The Trust later intervened as a plaintiff in the Association Action,[9] seeking rental income for the time it was unable to use the 10th floor unit as a result of the blowout. In the Association Action, the Association and the Trust asserted claims against JMB for breach of implied warranty, negligence and strict liability in tort; JMB asserted a cross-claim for contractual indemnification, common law contribution and indemnity, breach of contract, and negligence against Carson. JMB ultimately settled with the Association for $140,000 and with the Trust for $36,000.[10]

---

[8] **See** 68 Pa.C.S. §§ 3101-3414.

[9] The trial court granted the Trust's petition to intervene on October 24, 2014.

[10] Pennoni participated in the settlement, contributing $35,999 to the settlement with the Association and $9,000 to the settlement with the Trust. Pennoni is not a party to this appeal.

Following settlement, JMB continued to pursue its claims against Carson in both cases. In March 2015, JMB filed a motion for summary judgment against Carson, arguing that the undisputed facts of record left no doubt that Carson's negligence caused the blowout and, therefore, that JMB was entitled to $210,154.88, representing the amount it paid in its settlement with the Association and the Trust, as well as engineering fees and legal fees paid in the matter. The trial court denied JMB's motion, finding that JMB had not established that its settlement with the Association and the Trust was reasonable, and, therefore, that an issue of material fact still remained in the case.

On February 1, 2016, the court granted Carson's motion to consolidate the two cases for trial. *See* Pa.R.C.P. 213(c). In February 2016, the trial court held a three-day bench trial before the Honorable Patricia A. McInerney. At the conclusion of trial, the court found the following facts:

- Hairpins were missing;

- Carson did not put the hairpins in the area of the blowout;

- The hairpins were not there when the concrete was poured; and

- The blowout would not have occurred but for the absence of the hairpins.

Based upon these facts, the court made the following legal conclusions:

- Carson, as subcontractor, was negligent and breached its subcontract with JMB "in failing to place hairpins at the sweep at issue in this case;"

- 7 -

- Pennoni, as the inspector for the original owner and developer, was negligent "in failing to detect the absence of the hairpins at issue. . . upon its inspection of the 10th Floor before the concrete was poured."

- Liability was apportioned as follows: Carson 60%/Pennoni 40%; and

- JMB's claims against Carson for breach of contract and negligence failed where it did not prove that it had the inability to know Carson failed to place the hairpins despite the exercise of reasonable diligence where JMB "had representatives on the job site daily with ample opportunity to inspect the construction prior to the pour."

- JMB was entitled to indemnification against Carson on the Trust's underlying claim for breach of the implied warranty of habitability;

- The Association had no valid claim for breach of implied warranty of habitability against JMB because it was not a "first purchaser" in privity with the developer.

On February 11, 2016, the court entered an order awarding JMB $62,510.73[11] on its contractual indemnification claim against Carson and in favor of Carson on all other claims. On February 26, 2016, JMB filed post-trial motions. Subsequently, Carson filed post-trial motions. After oral argument on the motions, the trial court granted in part and denied in part JMB's post-trial motion and granted Carson's post-trial motion on June 7, 2016. Specifically, the court found that the missing hairpins were not reasonably discoverable by JMB. However, because JMB only suffered economic damages as result of its settlement of the underlying Plaintiffs' claims, the court concluded it could not recover on its breach of contract and

_____

[11] This figure represents the amount JMB paid to settle its claims with the Trust for lost rent ($36,000), reasonable attorneys' fees ($13,488.23) and engineering costs incurred ($13,022.50).

negligence claims against Carson. The trial court also reversed its finding that the Trust was the first purchaser of the 10th floor unit for purposes of establishing the third parties' underlying claims for breach of an implied warranty of habitability. Accordingly, the court struck its $62,510.73 damage award in favor of JMB and against Carson on JMB's indemnification claim.

JMB filed timely notices of appeal from the court's post-trial motion order and the final judgment, as well as a timely court-ordered Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. On appeal,[12] JMB raises the following issues for our consideration:

(1) Did the trial court err as a matter of law by failing to apply the appropriate measure of damages for Carson's breach of contract, where Pennsylvania law unambiguously holds that a general contractor who receives deficient performance from a subcontractor is entitled to the benefit of its bargain, as measured by the cost of repairing the defective work?

(2) Did the trial court err as a matter of law in rejecting JMB's indemnification claim against Carson, where its settlement of the underlying Plaintiffs' negligence claims was reasonable under all of the circumstances presented at the time?

(3) Did the trial court err as a matter of law by holding that the Beaumont Condominium Association's underlying claim against JMB for breach of implied warranty of habitability was invalid, and, therefore, rejecting JMB's indemnification

_____

[12] JMB filed two identical briefs raising the same "Questions Presented." We have only listed the issues once to avoid redundancy.

> claim against the culpable subcontractor for the cost of that settlement?

> (4) Was the trial court's finding that JMB failed to prove that the Bergamo Trust . . . was the first purchaser of the damaged condominium unit unsupported by competent evidence, where the Trustee testified at trial that he had represented the Trust since the condominium was formed?

Breach of Contract (JMB-Carson)

In its first issue on appeal, JMB asserts that the trial court incorrectly determined that it did not prove actual damages on its breach of contract claim[13] against Carson. Specifically, JMB claims that it is entitled to cost-of-repair damages as a recipient of a defective construction project where it was damaged by losing the benefit of its bargain.

> Pursuant to the Restatement (Second) of Contracts, § 348:

> (1) If a breach delays the use of property and the loss in value to the injured party is not proved with reasonable certainty, he may recover damages based on the rental value of the property or on interest on the value of the property.

> (2) **If a breach results in defective** or unfinished **construction and the loss in value to the injured party is not proved with sufficient certainty, he may recover damages based on**

>> **(a) the diminution in the market price of the property caused by the breach, or**

>> **(b) the reasonable cost of completing performance or of remedying the defects if that cost is not clearly disproportionate to the probable loss in value to him.**

---

[13] There is a six-year statute of limitations on this breach of contract action. *See* 42 Pa.C.S. § 5527. Instantly, the statute of limitations began to run at the time JMB was aware of the defects in Carson's concrete work, which would have been when the accident occurred in January 2013.

(3) If a breach is of a promise conditioned on a fortuitous event and it is uncertain whether the event would have occurred had there been no breach, the injured party may recover damages based on the value of the conditional right at the time of breach.

Restatement (Second) of Contracts, § 348 (emphasis added).

Carson contends that JMB is not entitled to cost-of-repair damages because it presented no evidence of diminution in value of the building. In fact, JMB suffered no loss in value to the unit. Rather, it was the Trust that suffered the loss in value. Moreover, JMB was not affected by any change in market price of the unit. Here, it was the Association that paid to remedy the damage to the unit and repair any structural defects in the Building as a result of the blowout. While JMB reimbursed the Association for those costs, it was not contractually obligated to do so. Thus, under section 348 of the Restatement, JMB is not the intended "injured party" that is entitled to the reasonable cost to remedy the defects.

JMB relies on **Douglass v. Liccardi Constr. Co.**, 562 A.2d 913 (Pa. Super. 1988), to support its argument that it is entitled to section 348 damages for Carson's defective concrete work. In **Douglass**, a builder breached its contract with owners of a home when it failed to construct the dwelling in accordance with the parties' contract and also performed some of the construction work in a defective and unworkmanlike manner. The jury entered a verdict in favor of the owners, awarding them $15,000, which represented the cost to correct the defects and complete the construction. The court noted, "the [owners] had contracted for [certain] things . . . and

- 11 -

they clearly had value to them. The jury was not compelled to accept the same or in reliance thereon conclude that the cost of repairing the defects in construction was disproportionate to the loss of value to [owners] because of such defects." *Id.* at 916.

On appeal, the builder argued that the jury's award was unsupported by the evidence. In upholding the verdict, the court cited to section 348, stating that because it is often difficult to prove with certainty the loss in value to the injured party, "he or she may elect to calculate the loss in value in accordance with Section 348(2) of the Restatement (Second) of Contracts." *Id.* at 915. Notably, the court recognized that our courts have generally allowed damages for defective performance of a building contract to be measured by the cost of completing the work or correcting the defects by another contractor.

Here, JMB was not in the same position as the owners in *Douglass* who were forced to correct the defective and non-compliant work performed by their builder. Rather, the Association paid the costs to repair the damage from the blowout and complete the work to fix structural issues from the accident. JMB simply did not have any "cost to remedy the construction defects" which is the measure of damages under section 348.

Indemnification Claims

In its next three issues, JMB argues that its settlement of the underlying claims with the Association and the Trust was both reasonable and makes Carson subject to its indemnification[14] obligation.

_____

[14] Instantly, the JMB-Carson subcontract provides the following indemnification clause:

Article 8 - Indemnification

8.1 **The Subcontractor agrees for itself and its insure[d] to indemnify, defend and hold harmless** Owner, **Contractor**, Architect, Engineer, and their parent, subsidiary and affiliated companies and their respective agents, officers, directors, employees and assigns **from and against any and all liabilities, claims, losses, damages, penalties, costs or expenses (including but not limited to court costs and reasonable attorney's fees) for damage to property whatsoever kind or nature** or injury to persons (including, but not limited to death) **arising out of or due to or claimed to have arisen out of or been due to** design, manufacture, delivery, installation, use, maintenance, repair, or operation of any part of all of the goods, material and equipment, if any, supplied by Subcontractor, or **the performance of the Work by Subcontracto**r, its agents, Independent Contractors, Sub-Subcontractors, vendors, and each of their agents, officers or employees, or any other of their operations, **no matter by whom performed for or on behalf of the Subcontractor.** Subcontractor's obligations under this indemnity shall not extend to property damage or personal injury caused by the sole negligence of indemnitee or its agents, officers, directors, employees and assigns.

*    *    *

8.3 **The Subcontractor shall bear any expense of an indemnitee because of any claim or other matter indemnified against hereunder, including reasonable attorney's fees and court costs in the defense of, or preparing for the defense of, or preparing for the defense against, any such claim**; even if such claim or any lawsuit

*(Footnote Continued Next Page)*

It is well-settled in Pennsylvania that provisions to indemnify for another party's negligence are to be narrowly construed, requiring a clear and unequivocal agreement before a party may transfer its liability to another party. ***Integrated Project Servs. v. HMS Interiors, Inc.,*** 931 A.2d 724, (Pa. Super. 2007). Accordingly, indemnification provisions are given effect only when clearly and explicitly stated in the contract between two parties. Moreover,

> [I]n Pennsylvania . . . provisions to indemnify for another party's negligence are to be narrowly construed, requiring a clear and unequivocal agreement before a party may transfer its liability to another party. ***Ruzzi v. Butler Petroleum Co.***, [] 588 A.2d 1, 7 (Pa. 1991); ***Perry v. Payne***, [] 66 A 553 (Pa. 1907).

***Bernotas v. SuperFresh Food Mkts., Inc.***, 863 A.2d 478, 482-83 (Pa. 2004). Finally,

> To establish the right to indemnification, the indemnitee must establish: the scope of the indemnification agreement; the nature of the underlying claim; its coverage by the indemnification agreement; the reasonableness of the alleged

*(Footnote Continued)* ————————————

> arising therefore is groundless, false or fraudulent. If any such claims has not been settled or discharged when the Work is finished, final settlement between the Contractor and the Subcontractor and final payment of the Subcontract Price and the acceptance of the Work shall be deferred until any such claim is paid or settled or the Subcontractor provides a bond, acceptable to the Contractor, in its sole discretion, to satisfy such claim.

Moreover, Carson assumed all the design responsibility for "converting the structure and foundations from structural steel and metal deck to post[-]tension reinforced concrete." ***Id.*** at 2.

expenses; and, **where the underlying action is settled rather than resolved by payment of a judgment, the validity of the underlying claim and the reasonableness of the settlement**.

***Burlington Coat Factory of Pa., LLC v. Grace Constr. Mgmt. Co., LLC***, 126 A.3d 1010, 1022 (Pa. Super. 2015) (citing ***McClure v. Deerland Corp.***, 585 A.2d 19, 22 (Pa. Super. 1991) (emphasis added). ***See Martinique Shoes, Inc. v. New York Progressive Wood Heel Co.***, 217 A.2d 781, 783 (1966) (to recover indemnity where there has been voluntary payment, party paying must himself be legally liable and show that he could have been compelled to satisfy claim).

Thus, in order for Carson to be legally obligated to indemnify JMB for settling with the Association and the Trust, the question boils down to whether those parties had valid causes of action against JMB.[15]

In speaking to that question, JMB claims that the trial court erred in concluding that its settlement with the Association and the Trust was not subject to Carson's duty to indemnify. Specifically, JMB asserts that it reasonably settled its claims with the Association, that the Trust was the first-purchaser of the damaged unit, and that the Association had a valid implied warranty of habitability in the common area where the accident occurred.

---

[15] Notably, there was no contractual privity between the Association and JMB or the Trust and JMB. In fact, JMB had only contracted with Builder.

Negligence

Instantly, the Association sued JMB for negligence as the project manager. Essentially, the Association alleged that JMB was liable for professional negligence where it did not ensure that its subcontractor, Carson, properly placed the hairpins in the post-tensioning system of the concrete superstructure for the Building.

The trial court concluded that JMB could not recover on this negligence theory, however, because it:

> failed to establish any [direct harm or] damages in regard to . . . negligence as the only damages in this case related to the settlement of underlying plaintiffs' causes of action and JMB's claims for indemnification of the settlement payments that were made to those plaintiff[s] and for legal expenses and investigating and engineering expenses pursuant to a contractual indemnification clause.

Post-Trial Trial Court Opinion, 9/12/16, at 11. Specifically, the trial court found that JMB failed to demonstrate either the causal relationship between the breach and the resulting injury suffered by it, or the actual loss suffered by it, necessary to support a cause of action for negligence. *Id.* at 23.

While JMB suffered a monetary loss by paying the Association and the Trust for the expenses it incurred in remedying the physical damage to the units and Building and lost rent, the trial court is correct in concluding that it did not suffer any actual physical or property damage. *See Adams v. Copper Beach Townhome Communities, L.P.*, 816 A.2d 301 (Pa. Super. 2003) (explaining economic loss doctrine which provides that no cause of action exists for negligence that results solely in economic damages

- 16 -

unaccompanied by physical injury or property damage). Thus, while there was actual property damage to the building as a result of Carson's negligence, JMB did not suffer any actual property or physical injury recoverable under a negligence theory.

Breach of Implied Warranty of Habitability

The Association and the Trust also sued JMB under a theory of breach of an implied warranty of habitability.

Pennsylvania law recognizes implied warranties in construction contracts where a builder sells a home to a residential purchaser. **Conway v. Cutler Group, Inc.**, 99 A.3d 67, 69-70 (Pa. 2014), citing **Elderkin v. Gaster**, 288 A.2d 771 (Pa. 1972). "[T]he warranties of habitability and reasonable workmanship are not created by representations of a builder-vendor[,] but rather are implied in law and as such, exist independently of any representations of a builder-vendor." **Tyus v. Resta**, 476 A.2d 427, 433 (Pa. Super. 1984). An implied warranty may be waived by clear and unambiguous contract language; however, "such language must be sufficiently particular to inform the home purchaser of the right he or she is waiving." **Pontiere v. James Dinert, Inc.**, 627 A.2d 1204, 1206 (Pa. Super 1993) (quoting **Tyus**, 476 A.2d at 432 (Pa. Super. 1984)). "To supply proper notice, language of disclaimer must refer to its effect on specifically designated, potential latent defects." **Tyus**, 476 A.2d at 432. Latent defects are those "which would not be apparent to an ordinary purchaser as a result of a reasonable inspection." **Tyus**, 476 A.2d at 433.

In ***1000 Grandview Assoc'n v. Mt. Washington Assoc'n***, 434 A.2d

796 (Pa. Super. 1981), our Court concluded that a condominium association

did have standing under PUCA's predecessor statute, the Unit Property Act,[16]

to assert such warranty claims, stating:

> [A]n association may have representational standing to assert the rights of its individual members, if it alleges an immediate, direct and substantial injury to any one of them. The allegations of the second count of the complaint, which are admitted for the purposes of the demurrer, . . . state that the appellees failed to comply with their implied and express warranties for the common areas resulting in, *inter alia*, cracked masonry, water leakage, a defective sewage pump, etc. **Surely these are allegations of a direct injury to the interests of the association's members which permit the association to claim standing.**

***Id.*** at 798 (emphasis added). Notably, the ***Grandview*** panel specifically

stated that PUCA was not applicable to its case;

> In concluding the discussion on the standing issue, we note that since this appeal was taken, the Pennsylvania legislature has repealed the Unit Property Act and has adopted the Uniform Condominium Act [PUCA], 68 Pa.C.S. § 3101 et seq. (Adopted on July 2, 1980, effective in 120 days). The new act specifically states that the condominium association, even if unincorporated, may "[i]nstitute, defend or intervene in litigation . . . ." 68 Pa.C.S. § 3302(a)(4). Moreover, even if the unit owners' association was formed before the effective date of the act, the association would still have standing to sue under the new statute if the complained of injury occurred after the act's effective date. 68 Pa.C.S. § 3102(a). Of course, the Uniform Condominium Act is not applicable to [the] instant case.

***Id.***

---

[16] 68 P.S. § 700.101, *et seq*.

Here the Association's complaint, filed pursuant to PUCA, alleges that:

As a result of the blow-out and shifting of the tendons, the tendons lost their necessary and designed tensioning, and thus failed to provide the concrete with the necessary and designed support. As a result of the aforesaid failure and the undermined structural integrity of the concrete floor, the habitability of all Units in The Building was compromised and posed a serious risk of harm, including the risk of potential collapse of the entire 10th floor, with the consequent impact upon all other floors above and below.

The defects in the construction of the post-tensioning system posed a substantial risk of harm and undetermined the structural integrity of the entire Building. The aforesaid structural defect and consequent blow-out of the post-tensioning cables seriously and dangerously compromised and negatively impacted the habitability of The Building and all of the Units therein.

Association's Complaint, 2/3/2014, at ¶¶ 20, 22, 41-42. However, the Association stated in its complaint that pursuant to section 3302(a)(4) of PUCA, it was "acting in its own name[,] . . . independent of any right of any individual Unit owner, past or present," and it did so "on a matter affecting the condominium." Association's Complaint, 2/3/2014, at ¶ 3. *Cf. Valley Forge Towers South Condominium v. Ron-Ike Foam Insulators, Inc.*, 574 A.2d 641 (Pa. Super. 1990) (condominium association, acting as legally authorized representative of unit owners under section 3302(4) of PUCA, sued roofing membrane manufacturer to honor its warranty; court reinstated association's cause of action under Pennsylvania's UTPCPL); *see* 68 Pa.C.S. § 3302(a)(4) of the Act, a condominium association may "[i]nstitute, defend or intervene in litigation . . . in its own name on behalf of itself or two or more unit owners on matters affecting the condominium.").

Thus, where the Association clearly chose *not* to assert the individual rights of any of the unit owners, but merely pursued its own interest in litigating the matter as explicitly stated under section 3302(4) of PUCA, we cannot apply the standing analysis announced in **Grandview**. We also decline to extend the implied warranty to an association in its own right where the Association had the opportunity to sue on behalf of the unit residents as their legally authorized representative and chose not to.

With regard to the Trust, we note that the implied warranty of habitability is not limited to first purchasers. **See Spivack v. Berks Ridge Corp.**, 586 A.2d 402 (Pa. Super. 1990). Rather, it is limited to first *user*-purchasers. **Conway v. Cutler Group, Inc.**, 99 A.3d 67 (Pa. 2014).

To prove that it was the first purchaser of Unit 10, the damaged unit, David Rasner, Esquire, testified on behalf of the Trust. Rasner testified that he is the co-trustee of the Trust which was established by his co-trustee's grandmother. He testified that the only asset that the Trust has is the 10th floor unit at the Beaumont and that the unit was rented out to tenants. Rasner testified that he thought he had been the co-trustee of the Trust since the unit was established and that he was co-trustee at the time of the blowout. N.T. Waiver Trial, 2/1/2016, at 69. The tenants renting the unit at the time of the blowout vacated the premises in March 2013, concluding that "the unit was uninhabitable and that they were concerned for their safety." **Id.** at 70-71. The Trust did not secure a new tenant until April 2014. **Id.** at

71. The Association paid the Trust approximately $19,000 to make the needed repairs to the damaged unit. *Id.* at 73-73.

Instantly, the Trust attached a copy of its agreement of sale for Unit 10 to its petition to intervene in the underlying matter. The agreement, entered into on March 9, 2007, indicates that The Bergamo Trust, c/o Laura Zarett, is purchasing "Unit 1000" at Beaumont Condominiums for $1,725,000.00. The agreement lists the Beaumont Corporation as the seller of the unit. However, as the trial court acknowledges, not only does that agreement purport to waive any implied warranty of habitability, ***Pontiere***, ***supra***; ***Tyus***, ***supra***, the statute of limitations on an action to enforce any warranty within the agreement had run by the time the Association sued JMB and the Trust intervened. Thus, we reluctantly agree with the trial court that neither the Association nor the Trust had a valid cause of action for breach of implied warranty against JMB.

Judgment and order affirmed.

Judge Ott joins this Memorandum.

Justice Fitzgerald files a Concurring and Dissenting Memorandum.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 11/3/2017