J-A09028-23

2023 PA Super 223

| | | |
|---|---|---|
| BENJAMIN D. HOSLER AND DAWN R. HOSLER | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| GARY L. TWEEDLIE AND SUSAN M. TWEEDLIE | : | No. 2 MDA 2022 |
| | : | |
| Appellants | : | |

Appeal from the Judgment Entered July 26, 2023,
In the Court of Common Pleas of Juniata County Civil Division at No(s):
2016-00265

BEFORE: PANELLA, P.J., OLSON, J., and KUNSELMAN, J.

OPINION BY OLSON, J.:                    **FILED:  NOVEMBER 1, 2023**

Appellants, Gary L. Tweedlie and Susan M. Tweedlie, husband and wife, (collectively, "Sellers") appeal from the July 26, 2023 judgment[1] entered in the Court of Common Pleas of Juniata County upon a non-jury verdict in favor of Buyers.  We affirm the judgment, in part, and vacate the judgment, in part, and remand the case in accordance with this opinion.

---

[1] Sellers originally appealed from the December 2, 2021 order denying their post-trial motion seeking, *inter alia*, judgment *non obstante veredicto* ("JNOV").  "[A]n appeal to this Court can only lie from judgments entered subsequent to the trial court's disposition of any post-verdict motions, not from the order denying post-trial motions." ***Johnston the Florist, Inc. v. TEDCO Constr. Corp.***, 657 A.2d 511, 514 (Pa. Super. 1995).  Upon remand of this case, as more fully discussed herein, judgment was entered on July 26, 2023, in favor of Benjamin D. Hosler and Dawn R. Hosler, husband and wife (collectively, "Buyers") in the amount of $49,879.87.  Sellers' appeal properly lies from the July 26, 2023 judgment.  ***Id.***; ***see also*** Pa.R.A.P. 905(a)(5) (stating, "[a] notice of appeal filed after the announcement of a determination but before the entry of an appealable order shall be treated as filed after such entry and on the day thereof").  The caption has been corrected accordingly.

The record reveals that, on August 2, 2016, Buyers filed a complaint against Sellers alleging causes of action for breach of contract, fraud, and failure to disclose pursuant to the Real Estate Seller Disclosure Law[2] ("RESDL") in connection with Buyers' purchase of a residential property from Sellers. On August 16, 2016, Sellers filed a preliminary objection pursuant to Pennsylvania Rule of Civil Procedure 1028(6), asserting that Buyers' civil action was not ripe for resolution because Buyers failed to first submit their disputed claims to mediation, as previously agreed to by the parties. The trial court sustained Sellers' preliminary objection on May 3, 2017.

On July 31, 2017, Buyers filed an amended complaint against Sellers, alleging the same three causes of actions as contained in the original complaint and asserting that Sellers refused to avail themselves of the opportunity to submit the matter to mediation/arbitration.[3] On August 9, 2017, Sellers filed preliminary objections to Buyers' amended complaint, asserting, *inter alia*, the pendency of mediation. The trial court sustained

---

[2] 68 Pa.C.S.A. §§ 7301 – 7315.

[3] Throughout the litigation and appeal, the parties use the terms "mediation" and "arbitration" interchangeably. Although these are two different concepts and proceedings, this does not impact our ability to address the issues raised by Sellers, and we need not concern ourselves with the differences between a mediation and an arbitration.

Sellers' preliminary objections and ordered the parties to submit the matter to mediation.[4]

On October 1, 2019, a board of three arbitrators awarded Buyers $12,000.00 in damages and $1,000.00 in attorney's fees. On October 2, 2019, Sellers appealed the arbitration award, demanding a trial *de novo*. **See** 42 Pa.C.S.A. § 7361(d) (stating that, "[a]ny party to a matter [disposed of by compulsory arbitration] shall have the right to appeal for trial *de novo* in the [trial] court").

On October 26, 2020, the trial court conducted a non-jury trial, at the conclusion of which the parties were ordered to submit proposed findings of fact and conclusions of law. Sellers submitted their proposed findings of fact and conclusions of law on December 21, 2020, and Buyers submitted their findings of fact and conclusions of law on December 28, 2020.

On June 29, 2021, the trial court entered a verdict in favor of Buyers and against Sellers on each of Buyers' three causes of action and awarded judgment in the amount of $49,879.87.[5] In its June 29, 2021 verdict, the trial court ordered the prothonotary to enter judgment in favor of Buyers and

---

[4] The trial court order sustaining Sellers' preliminary objections was dated December 12, 2017, but was not docketed by the trial court until December 27, 2017. In the meantime, Sellers filed an answer and new matter to Buyers' original complaint on December 22, 2017.

[5] The trial court awarded judgment in the amount of $38,370.94 on each cause of action after entering a verdict in favor of Buyers on their claims of breach of contract, fraud, and failure to disclose under RESDL. The trial court also awarded $11,508.93 for attorney's fees.

against Sellers in the amount of $49,879.87 which the prothonotary did on the same day.

Sellers filed a motion for post-trial relief seeking JNOV on July 9, 2021, and a brief in support of their motion for post-trial relief on October 8, 2021. Buyers filed a brief in opposition to Sellers' motion for post-trial relief on November 22, 2021. On December 2, 2021, the trial court denied Sellers' request for JNOV and "confirm[ed] its order entering judgment in favor of [Buyers] and against [Sellers] in the amount of $49,879.87." Trial Court Order, 12/2/21 (extraneous capitalization omitted). On December 28, 2021, Sellers filed a notice of appeal challenging the December 2, 2021 order denying JNOV. Sellers filed a concise statement of errors complained of on appeal pursuant to Pennsylvania Rule Appellate Procedure 1925(b) on January 12, 2022. On January 27, 2022, the trial court filed its Rule 1925(a) opinion stating that it was relying on the record to address Sellers' issues.[6]

On July 25, 2023, this Court remanded the case to the trial court for the entry of judgment. *Hosler v. Tweedlie*, 2023 WL 4742383, at *3 (Pa. Super. filed July 25, 2023) (unpublished memorandum)  In so doing, we explained,

> The entry of judgment on June 29, 2021, was premature because the judgment was entered before the expiration of the 10-day period in which to file a motion for post-trial relief. *Jenkins*[ *v. Robertson*], 277 A.3d [1196,] 1198 [(Pa. Super. 2022)]. As

---

[6] In its Rule 1925(a) opinion, the trial court stated that it was relying on the record without issuance of a further opinion because the trial court judge who presided over the October 26, 2020 non-jury trial was "no longer an acting [j]udge." Rule 1925(a) Opinion, 1/27/22.

such, the June 29, 2021 entry of judgment is void and of no legal effect. *Id.* The record further demonstrates that neither party filed a *praecipe* for entry of judgment, and judgment was never entered by the prothonotary after the December 2, 2021 denial of [Sellers'] motion for post-trial relief. Because judgment was never entered outside the 10-day period in which to file a timely post-trial motion, this Court is without jurisdiction to address the merits of [Sellers'] issues. *Ryan*[ *v. GAF Corp*], 665 A.2d [843,] 844 [(Pa. Super. 1995)].

*Tweedlie*, 2023 WL 4742383, at *3.[7]

On July 26, 2023, the prothonotary for the Court of Common Pleas of Juniata County entered judgment in favor of Buyers and against Sellers in the amount of $49,879.87. Having perfected our jurisdiction in this matter, we now turn to Sellers' appeal.

Sellers raise the following issues for our review:

1. Did the trial court err and abuse its discretion when there was legally insufficient evidence for a verdict of breach of contract as to [Sellers], where there was an express contractual release upon waiver of inspection rights?

2. Did the trial court err and abuse its discretion when there was legally insufficient evidence for a verdict of fraud by [Sellers]?

3. Did the trial court err and abuse its discretion when it found breach of an implied warranty of habitability without basis in law or fact?

4. Did the trial court err and abuse its discretion by awarding the [] demolition and replacement cost when the evidence

_____

[7] In remanding this case, we recognized that the parties had already submitted appellate briefs and participated in oral argument before this Court. *Tweedlie*, 2023 WL 4742383, at *3. In the interest of judicial economy, we did not require the parties to submit additional appellate briefs upon entry of judgment. *Id.* at *3 n.6.

- 5 -

did not establish that demolition and replacement was required?

5. Did the trial court err and abuse its discretion by awarding attorney's fees, in absence of a recognized exception to the American Rule?

Sellers' Brief at 2 (extraneous capitalization omitted).

Our standard and scope of review in an appeal from a judgment entered on a non-jury verdict

is to determine whether the findings of the trial court are supported by competent evidence and whether the trial court committed error in any application of the law. The findings of fact of the trial [court] must be given the same weight and effect on appeal as the verdict of a jury. We consider the evidence in a light most favorable to the verdict winner. We will reverse the trial court only if its findings of fact are not supported by competent evidence in the record or if its findings are premised on an error of law.

*J.J. DeLuca Co., Inc. v. Toll Naval Assoc.*, 56 A.3d 402, 410 (Pa. Super. 2012) (citation omitted).

In the case *sub judice*, the trial court, as trier-of-fact, made the following findings of fact:

1. The property was purchased by [Sellers] on [] June [2,] 2011.

2. Shortly after purchasing the property, [Sellers] had an 8-foot by 20-foot addition built onto an existing structure on the house.

3. [Sellers] did not obtain a building permit for the construction of the addition nor did they obtain an occupancy permit upon completion of the construction.

4. The [trial] court finds that structural changes were made to the residence, which required that a building permit be issued.

- 6 -

5.     Due to the fact the building permit was not issued, the addition to the residence was never inspected by a code enforcement officer or other authorized inspector.

6.     The "foundation" supporting the new addition was two 5-gallon buckets filled with stone and buried approximately 18 inches underground, not the 36 inches required by code.

7.     There was no concrete fill underneath the buckets.

8.     The addition was used as living space by [Sellers] in that a laminate floor was installed, the addition was [drywalled] and painted, electric wiring was run behind the [drywall, and a] beaded board ceiling, windows and an exterior door were included in the addition.

9.     The property was sold to [Buyers] by [Sellers] in 2015.

10.    The Listing Agreement prepared by Sellers' real estate agent listed the addition as a [sunroom] with living space of 342 square feet.

11.    The [sunroom] was included as living space in determining the purchase price of the property.

12.    Approximately 6 months after the sale of the real estate, [Buyers] noticed that defects were beginning to appear in the [sunroom].  These defects included, but were not limited to, cracks in the [drywall], cracks above the windows, separation of the windows from the wall, inability of the windows to operate properly (open and []shut completely)[,] and the floor was no longer level.

13.    [Buyers] called [Sellers] to discuss these issues.  [Sellers] never responded.

14.    [Buyers] also noted other defects such as [the] T-11 siding was flush with the ground, the shingles were pulling off the roof[,] and [the roof leaked].

15.    [Sellers] did not put a concrete slab under the [sunroom] addition due to a sewer line running under that space.

16.    [Buyers] would not have paid what they ultimately paid for the property had they known [of] the defective condition of the [sunroom].  They also testified that they would not have

purchased the property if they had known the [sunroom] had serious defects.

17.     On [] February [27,] 2020, an estimate to remove and replace the [sunroom], in the amount of $38,370.94 was given to [Buyers].

18.     On [] February [27,] 2020, an estimate as to the cost to repair the foundation, windows, flooring, ceiling, *et cetera*, was given to [Buyers] in the amount of $45,366.94.

19.     [Buyers have] taken steps to control the damage caused by the defects in the [construction] of the [sunroom].

20.     [Buyers] waived a home inspection prior to purchase.

21.     The estimates given to [Buyers] on [] February [27,] 2020, would, as of [the] date of trial, increased 15% to 20% due to market conditions.

22.     [Sellers] reviewed the construction [of] the [sunroom] every other day, [for] at least 10 to 15 minutes.

23.     [Sellers] purchased most, if not all, of the materials for the construction of the addition.

24.     [Seller,] Gary Tweedlie[,] was an experienced builder, a contractor and landlord.  He was aware that a building permit was needed for the construction of the [sunroom] addition.  The [trial] court [found] that Mr. Tweedlie's testimony that he was not aware a building permit was needed or that he assumed his employees would obtain one was incredulous.

25.     [Sellers] failed to disclose on the [RESDL] form that they had not obtained a building permit for the construction of the [sunroom.]

26.     [Buyers] purchased the real estate on June 26, 2015, from [Sellers] for a price of $285,568.84.

27.     [Buyers] filed suit against [Sellers] on three grounds.  First, breach of contract, second on fraud[,] and third on violation of [RESDL].

Trial Court Opinion, 6/29/21, at 1-4 (extraneous capitalization omitted).

We begin by addressing Sellers' first and third issues, which challenge the verdict in favor of Buyers on their breach of contract claim. Sellers assert that there was insufficient evidence to support a finding by the trial court that Sellers breached their agreement with Buyers. Sellers' Brief at 6-7, 28-29. Specifically, Sellers assert that the Agreement of Sale included waiver clauses that "expressly and unequivocally disclaimed any [] warrant[ies]" including an implied warranty of habitability. *Id.* at 6-7. Sellers argue that "[r]eading the contract [] in accordance with [its] express terms, all contractual warranties as to the structure were expressly waived and claims under [the] contract released." *Id.* at 28. Sellers assert that "[t]he waiver[ clauses in the contract] control as to the [breach of contract] claim and it was an error of law to hold otherwise." *Id.* at 29.

In the case *sub judice*, Sellers do not dispute the existence of a valid contract between the parties for the purchase of the residential home at issue but, rather, they dispute the terms of that contract, and in particular the existence of an implied warranty of habitability.[8] As such, we turn to an

_____

[8] The trial court awarded damages in favor of Buyers on their breach of contract claim. This award was based upon the trial court's limited finding that Sellers breached the implied warranty of habitability. As such, our review of Sellers' claims is limited to the applicability of the implied warranty of habitability as a means for awarding damages on a breach of contract claim in the case *sub judice*. **See Ecksel v. Orleans Co.**, 519 A.2d 1021, 1026 (Pa. Super. 1987) (stating that, because an implied warranty of habitability is inherent in a contract, the failure to couch a breach of contract cause of action in the exact terms of this implied warranty "does not preclude the [trial] court from ruling upon that theory").

- 9 -

examination of the law governing an implied warranty of habitability as it applies to the purchase of a residential home.  In the seminal case, **Elderkin v. Gaster**, 288 A.2d 771 (Pa. 1972), our Supreme Court held that a "builder-vendor impliedly warrants that the home he[, or she, builds and sells] is constructed in a reasonably workmanlike manner and that it is fit for the purpose intended—habitation." **Elderkin**, 288 A.2d at 777.  In reaching this conclusion, the **Elderkin** Court began by examining the common law doctrine of *caveat emptor*, which required "that in the absence of fraud or misrepresentation[,] a vendor is responsible for the quality of the property being sold by him[, or her,] only to the extent for which he[, or she,] expressly agrees to be responsible." **Id.** at 774.  Our Supreme Court noted that "[t]he theory of the [*caveat emptor*] doctrine is that the buyer and seller deal at arm's length, each with an equal means of knowledge concerning the subject of the sale, and that therefore the[] buyer should be afforded only those protections for which he[, or she,] specifically contracts." **Id.** at 774-776 (stating, "[c]*aveat emptor* developed when the buyer and seller were in an equal bargaining position[,] and they could readily be expected to protect themselves in the deed").  The **Elderkin** Court reasoned, however, that a "builder-vendor is manifestly in a better position than the normal vendee to guard against defects in the home site and if necessary to protect himself[, or herself,] against potential but unknown defects in the projected home site." The **Elderkin** Court recognized "that the implied warranties of habitability and reasonable workmanship were necessary to equalize the disparate positions

- 10 -

of the builder-vendor and the average home purchaser by safeguarding the reasonable expectations of the purchaser compelled to depend upon the builder-vendor's greater manufacturing and marketing expertise." **Tyus v. Resta**, 476 A.2d 427, 431 (Pa. Super. 1984).

Based upon **Elderkin**, and its progeny, the doctrine of implied warranty of habitability, which requires a builder-vendor to warrant that the construction of the new home was performed in a reasonably workmanlike manner and that the home is fit for habitation, arises impliedly in a contract between a builder-vendor and the first purchaser of the newly constructed home. **See Elderkin**, 288 A.2d at 777; **see also Tyus**, 476 A.2d at 431; **Conway v. Cutler Group, Inc.**, 99 A.3d 67, 70-73 (Pa. 2014) (declining to extend the doctrine of implied warranty of habitability to second and subsequent purchasers of the home due to lack of privity between that purchaser and the builder-vendor). Therefore, in order to recover for a breach of contract claim based upon a breach of an implied warranty of habitability, a plaintiff must demonstrate that (1) the seller is a builder-vendor; (2) the plaintiff is a purchaser in privity of contract with the builder-vendor; (3) that the residential property involves a newly-constructed home; (4) that the construction was not performed in a reasonably workmanlike manner; and (5) as a result of the defective construction, the newly-constructed home is not habitable. **See Elderkin**, 288 A.2d at 777; **see also Tyus**, 476 A.2d at 431; **Conway**, 99 A.3d at 70-73. Pertinent to our disposition herein is the definition of a "builder-vendor," which for purpose of the implied warranty of habitability

- 11 -

is "one who buys land and builds a home upon that land for purpose of sale to the general public."[9]  **Elderkin**, 288 A.2d at 774 n.10.  Additionally, "[c]ompared to the ordinary home purchaser, the builder-vendor possesses superior knowledge and expertise in all aspects of building, including its legal aspects."  **Tyus**, 476 A.2d at 431 (citation and original quotations marks omitted).

Here, the trial court, in finding in favor of Buyers on their breach of contract claim, held Gary Tweedlie out as a "builder-vendor" who breached an implied warranty of habitability in the contract with Buyers for the purchase of the residential property because he failed "to provide a habitable [sunroom], which impacted the habitability of the entire residence."  Trial Court Opinion, 6/29/21, at 4-5 (stating that, Gary Tweedlie was not only the vendor of the real estate but also the builder of the [sunroom] which was added on to the house during his ownership"); **see also id.** at ¶24 (stating, "Gary Tweedlie was an experienced builder, a contractor[,] and landlord").

Based upon **Elderkin**, and its progeny, we find that the trial court erred as a matter of law by designating Gary Tweedlie as a builder-vendor and, thus, erred in determining that the doctrine of implied warranty of habitability applied in the case *sub judice*.  As discussed *supra*, the **Elderkin** Court defined

---

[9] In defining "reasonable workmanship," the **Elderkin** Court explained that this term was "not the equivalent of building perfection, but must be viewed as meaning reasonable under the circumstances."  **Elderkin**, 288 A.2d at 776 n.13.  The **Elderkin** Court further noted that "'habitable' is not easily defined and must be approached on a case[-]by[-]case basis."  **Id.**

a builder-vendor as someone who buys land and builds a home upon that land for purposes of sale to the general public. **Elderkin**, 288 A.2d at 774. This Court further curtailed that definition by stating that a builder-vendor possesses "superior knowledge and expertise in all aspects of building, including its legal aspects." **Tyus**, 476 A.2d at 431. While we concur with the trial court that Gary Tweedlie is an experienced builder and contractor (**see** Trial Court Opinion, 6/29/21, at ¶24), we cannot find that his skills as a builder and contractor fall within the definition of a builder-vendor contemplated by the **Elderkin** Court, and its progeny, for purpose of an implied warranty of habitability.

Gary Tweedlie testified that he was the owner of a steel fabrication company until his retirement in June 2010. N.T., 10/26/20, at 216. When asked on cross-examination what type of construction he performed, Gary Tweedlie responded "structural steel," explaining that he erected the structural steel framework for commercial establishments. **Id.** at 240-241. He further explained that once he erected the structural steel shell of a building, a general contractor finished building the commercial building. **Id.** at 241.

The implied warranty of habitability is limited to residential construction, as it was intended to equalize the positions of an experienced builder-vendor and a home buyer in negotiations involving a residential home. As such, a builder-vendor, for purpose of the implied warrant of habitability, is someone who possesses specialized skills in building all aspects of a residential home,

including acquisition of any necessary building permits and occupancy permits, and does so with the intent of selling that residential home for profit. *See Elderkin*, 288 A.2d at 774 n.10. Here, Gary Tweedlie's skill set was limited to the fabrication of steel and the erection of structural shells for commercial buildings that were later finished by a general contractor. Within the purview of *Elderkin*, and its progeny, even viewing the evidence in the light most favorable to Buyers, as verdict winners, Gary Tweedlie does not qualify as a "builder-vendor" for purpose of the implied warranty of habitability. Therefore, the trial court erred as a matter of law in relying on the doctrine of an implied warranty of habitability to find that Sellers breached their contract with Buyers.

In the second issue, Sellers challenge the trial court's verdict on Buyers' fraud claim on the ground that there was insufficient evidence to support a finding of fraud. Sellers' Brief at 30-33. Sellers assert that whether they "knew that the post foundations were defective and constituted a material defect at the time of closing is the actual issue" in the fraud claim. *Id.* at 33. Sellers argue that "[a]bsence of disclosure, one way or another, as to the permit status of a home improvement in no way establishes knowledge that there is a material defect in the home." *Id.*

It is well-established that

[t]o prove fraud, a plaintiff must demonstrate by clear and convincing evidence:

(1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or

- 14 -

recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance.

***Blumenstock v. Gibson***, 811 A.2d 1029, 1034 (Pa. Super. 2002), *quoting*

***Gibbs v. Ernst***, 647 A.2d 882, 889 (Pa. 1994), *appeal denied*, 828 A.2d 349

(Pa. 2003).[10]  "[F]raud consists of anything calculated to deceive, whether by single act or combination, or by suppression of truth, or suggestion of what is false, whether it be by direct falsehood or by innuendo, by speech or silence, word of mouth, or look or gesture."  ***Moser v. DeSetta***, 589 A.2d 679, 682 (Pa. 1991).  "The concealment of a material fact can amount to a culpable misrepresentation no less than does an intentional false statement."  ***Id.***

In finding in favor of Buyers and against Sellers on the fraud cause of action, the trial court stated,

> The second cause of action presented by [Buyers] is a claim for fraud.  Fraud is based on a representation that the home was in good and marketable condition and that it had a properly constructed [sunroom].  In order to prove fraud, [Buyers] must also show that false representations were made by [Sellers] pertaining to the good and marketable condition of the home, that [Sellers] knew the representations were false [or they were] reckless in making those representations[,] and they intended to mislead [Buyers].

---

[10] The ***Gibbs*** Court explains that a cause of action for fraud is also commonly referred to as a cause of action for intentional misrepresentation.  ***Gibbs***, 647 A.2d at 889; ***see also Gregg v. Ameriprise Fin., Inc.***, 245 A.3d 637, 645 (Pa. 2021) (referring to a cause of action for fraud as synonymous to a cause of action for intentional misrepresentation).

The [trial] court believes that by failing to disclose on the [RESDL] form whether or not a building permit had been issued, rises to the level of fraud on the part of [Sellers].

The law is well[-]settled that [a] seller is required to disclose all material defects of which [he or she] had knowledge. [Gary] Tweedlie testified that he was not aware that a building permit was needed and, if it was needed, it was the responsibility of his employees. The [trial] court finds that testimony to be untruthful and finds that the failure to disclose the non-existence of a building permit was done with the intent to mislead [Buyers]. The [trial] court, therefore, awards damages for the fraud claim in the amount of $38,370.94.

Trial Court Opinion, 6/29/21, at 5 (extraneous capitalization omitted).

The trial court based its finding of fraud not upon the representations (or material omissions) contained within the Agreement of Sale but, rather, upon Sellers' representations contained within the RESDL form.[11]  RESDL,

_____

[11] We discern no error in the trial court's reliance upon the representations contained in the RESDL form, rather than the Agreement of Sale. Paragraph 25(A) of the Agreement of Sale states, in pertinent part,

All representations, claims, advertising, promotional activities, brochures or plans of any kind made by Seller, Brokers, their licensees, employees, officers[,] or partners are not a part of this Agreement **unless expressly incorporated** or stated in this Agreement. This Agreement contains the whole agreement between Seller and Buyer, and there are no other terms, obligations, covenants, representations, statements[,] or conditions, oral or otherwise, of any kind whatsoever concerning this sale.

Buyers' Exhibit M (Agreement of Sale) at ¶25(A) (emphasis added). Although paragraph 10(E) of the Agreement of Sale informs Buyers of Sellers' obligations to make certain representations pursuant to RESDL, this paragraph does not expressly incorporate the representations previously made by Sellers pursuant to RESDL into the Agreement of Sale. Moreover, we can find no provision in RESDL that expressly states that representations made pursuant

which became effective in 2001, requires a seller of real property, except in certain instances not present in the case *sub judice*, to disclose to a buyer, prior to the signing of an agreement of sale or transfer, "any material defects with the property known to the seller[.]"[12]  68 Pa.C.S.A. §§ 7302 and 7303. The term "material defect" is defined as

> A problem with a residential real property or any portion of it that would have a significant adverse impact on the value of the property or that involves an unreasonable risk to people on the property.  The fact that a structural element, system[,] or subsystem is near, at[,] or beyond the end of the normal useful life of such a structural element, system[,] or subsystem is not by itself a material defect.

68 Pa.C.S.A. § 7102.

At a minimum, a seller, pursuant to RESDL, is required to make disclosures pertaining to material defects

_____

to this law are incorporated into an agreement of sale.  ***See*** 68 Pa.C.S.A. §§ 7301 – 7315.  Rather, Section 7303 of RESDL simply requires that "[a] signed and dated copy of the property disclosure statement shall be delivered to the buyer in accordance with section 7305 (relating to delivery of disclosure form) prior to the signing of an agreement of transfer by the seller and buyer with respect to the property."  68 Pa.C.S.A. § 7303.  Absent express incorporation of the RESDL form into an agreement of sale, which is not present in the case *sub judice*, representations made in the RESDL form cannot be found to exist within the four corners of an agreement of sale.

[12] "RESDL is intended to protect the purchaser of real property, and the method of protection is a disclosure statement . . . that the seller has to complete so that presumably the buyer accurately knows what the seller knows about the property when the sale occurs."  ***Phelps v. Caperoon***, 190 A.3d 1230, 1245 (Pa. Super. 2018) (citation and original quotation marks omitted).

with respect to all of the following subjects: (1) seller's expertise in contracting, engineering, architecture[,] or other areas related to the construction and conditions of the property and its improvements[;] (2) when the property was last occupied by the seller[;] (3) roof[;] (4) basements and crawl spaces[;] (5) termites/wood destroying insects, dry rot[,] and pests[;] (6) structural problems[;] (7) **additions, remodeling[,] and structural changes to the property**[;] (8) water and sewage systems or service[;] (9) plumbing system[;] (10) heating and air conditioning[;] (11) electrical system[;] (12) other equipment and appliances included in the sale[;] (13) soils, drainage, boundaries[,] and sinkholes[;] (14) presence of hazardous substances[;] (15) condominiums and other homeowners associations[;] (16) **legal issues affecting title or that would interfere with use and enjoyment of the property**[;] (17) condition, if known, and location of all storm water facilities, including a statement disclosing whether ongoing maintenance of the storm water facilities is the responsibility of the property owner or the responsibility of another person or entity.

68 Pa.C.S.A. § 7304(b) (formatting modified; extraneous capitalization omitted; emphasis added). Section 7308 of RESDL places an affirmative duty on the seller, in completing a disclosure form, to "not make any representations that the seller or the agent for the seller knows or has reason to know are false, deceptive[,] or misleading and shall not fail to disclose a known material defect." 68 Pa.C.S.A. § 7308. "The seller is not obligated [under RESDL] to make any specific investigation or inquiry in an effort to complete the property disclosure statement." *Id.* "If at the time the disclosures are required to be made, an item of information required to be disclosed is unknown or not available to the seller, the seller may make a disclosure based on the best information available to the seller." 68 Pa.C.S.A. § 7306.

A review of the RESDL form in the case *sub judice* reveals that Sellers disclosed that, as an addition to the home, a "side porch was expanded [and] enclosed with windows[.]" **See** Buyers' Exhibit E at ¶8. In making this disclosure, Sellers left blank, or did not provide an answer to, the following questions pertaining to disclosures involving the sunroom addition:

[1.] Approximate date of work.

[2.] Were permits obtained? (Yes/No/Unknown)

[3.] Final inspections/approvals obtained? (Yes/No/Unknown)

**Id.** Finally, under the "miscellaneous" section of the RESDL form, Sellers answered "no" to the question, "Are you aware of any material defects to the property, dwelling, or fixtures which are not disclosed elsewhere on this form?" **Id.** at ¶20(D)(1).

Gary Tweedlie testified that he employed two former employees of his steel fabrication company to construct the sunroom. N.T., 10/26/20, at 220. The parties did not enter into a written contract regarding the construction project. **Id.** Rather, Gary Tweedlie stated that he told the two former employees what he wanted as an end-product, *i.e.*, a sunroom, and left it to the former employers to determine how to achieve the end result. **Id.** The former employees were paid cash for their labor, and Gary Tweedlie procured the necessary supplies for the construction project based upon a list provided by the employees. **Id.** at 221. Gary Tweedlie testified that he never obtained building or occupancy permits but, rather, thought the two former employees would obtain the necessary permits. **Id.** at 223, 237. The building code

official for the township in which the residence was located testified that either the homeowner or a person representing the homeowner could apply for a building permit but that, ultimately, it was the responsibility of the homeowner to ensure that a building permit was obtained for an addition such as the sunroom. *Id.* at 28. Gary Tweedlie stated that, in completing the RESDL form, he was aware that he did not obtain a building permit but was unaware if the two former employees obtained a building permit. *Id.* at 237-238. As such, he did not provide an answer to the question, "Were permits obtained? (Yes/No/Unknown)." *Id.*

In viewing the evidence in the light most favorable to Buyers, as verdict winners, we concur with the trial court, and the record supports, that Sellers failed to make a disclosure of a material defect pertaining to the sunroom, namely that neither a building permit nor an occupancy permit were obtained relative to the construction.[13] Pursuant to RESDL, a material defect includes "legal issues affecting title or that would interfere with use and enjoyment of the property[.]" As such, the lack of a building permit and, ultimately, an occupancy permit, relating to an addition such as a sunroom, or the construction of the over-all residence, constitutes a material defect because the lack thereof affects the good and marketable title of the property and the

_____

[13] The building code official testified that when a homeowner applies for a building permit, the application also serves as a request to have an occupancy permit issued once the construction is inspected and determined to have been built in accordance with all applicable building code regulations. N.T., 10/26/20, at 34.

use and enjoyment of the property, at least until the proper permits can be obtained. In completing the RESDL form, Sellers failed to disclose, at the very least, that it was "unknown" whether a building permit or an occupancy permit had been obtained for the sunroom addition. The trial court found Gary Tweedlie's testimony that he did not understand the need to obtain a building permit or occupancy permit for the construction of a building or residence to be incredulous based upon his experience, as a steel fabricator, in the construction business. As such, this failure to make any disclosure regarding a building permit or final approval, *i.e.*, an occupancy permit, constituted a reckless disregard for whether the permits were or were not obtained.

Therefore, relative to Buyers' fraud claim, we discern no error or abuse of discretion in, and the record supports, the trial court's determinations that Sellers, in the course of completing the RESDL form, made a representation that was material to the transaction, *i.e.*, whether a building permit or occupancy permit had been obtained, and that the representation was made with reckless disregard as to its veracity with the intent of misleading Buyers. *See Blumenstock*, 811 A.2d at 1034. Buyers were required, however, to show that they justifiably relied upon the representation. *See id.*

At trial, Benjamin Hosler testified that he did not inquire as to whether Sellers secured a building permit in conjunction with the sunroom addition

until after the purchase of the residence was completed.[14]  N.T., 10/25/20, at 94 (stating that, on January 10, 2016, he received an electronic mail response to his inquiry indicating the lack of a land use permit).  On cross-examination, when asked whether Sellers' failure to answer "yes, no, or unknown" on the building permit and occupancy permit questions relative to the sunroom disclosure was of concern to him, Benjamin Hosler stated, "[i]t didn't concern me[.]"  *Id.* at 124.  Benjamin Hosler explained, however, that absent those representations regarding the building permit and occupancy permit, he would have still purchased the house but would have offered less money.  *Id.* at 148-150.

Even when viewed in the light most favorable to Buyers as verdict winners, Benjamin Hosler's testimony that he was not concerned about the lack of Sellers' answers regarding the existence of a building permit or occupancy permit for the sunroom addition negates a finding, in the case *sub judice*, that Buyers justifiably relied upon the information provided, or lack of information, in deciding to purchase the residence.[15]  The RESDL form

---

[14] The RESDL form included a pre-printed "note to buyer," which, in pertinent part, stated that "[b]uyers should check with the municipality to determine if permits [or] approvals were necessary for disclosed work and[,] if so, whether they were obtained."  Buyers' Exhibit E at ¶8.

[15] In finding in favor of Buyers on the fraud cause of action, the trial court stated, "[i]n order to prove fraud, [Buyers] must [] show that false representations were made by [Sellers] pertaining to the good and marketable condition of the home, that [Sellers] knew the representations were false [or were] reckless in making those representations[,] and they intended to

contained a notice to Buyers, as discussed *supra*, that advised them to check with the municipality to determine if permits had been obtained for the addition. In light of Sellers' failure to provide answers regarding the status of the building and occupancy permits, as well as the notice to Buyers to check with the municipality, Buyers failed to prove by clear and convincing evidence that their reliance on these unanswered questions was justified. **See Porreco v. Porreco**, 811 A.2d 566, 571 (Pa. 2002) (stating, courts are "hesitant to find reliance justified where the party claiming reliance had an adequate opportunity to verify the alleged fraudulent statements") (Opinion Announcing the Judgment of the Court). Therefore, the trial court erred as a matter of law and abuse its discretion in awarding a verdict in favor of Buyers based upon a cause of action for fraud.

To the extent that Sellers challenge the trial court's verdict in favor of Buyers based on a cause of action for failure to disclose a material defect pursuant to RESDL, we discern no abuse of discretion or error of law in the trial court's determination.[16] The disclosures required under RESDL, as

_____

mislead [Buyers]." Trial Court Opinion, 6/29/21, at 5. In discussing the elements necessary to establish a cause of action for fraud, the trial court failed to recognize, and consider, *inter alia*, the element of "justifiable reliance." **Blumenstock**, 811 A.2d at 1034.

[16] In order to establish a cause of action for violation of RESDL, the buyer must establish that the seller had a duty to disclose the material defect, that the seller willfully or negligently breached that duty, and as a result of that breach, buyer suffered actual damages. **See** 68 Pa.C.S.A. § 7311; **see also Medlock v. Chilmark Home Inspections, LLC**, 195 A.3d 277, 290

discussed *supra*, are mandatory. ***See*** 68 Pa.C.S.A. § 703 (stating, the seller

"**shall** disclose to the buyer any material defects with the property" (emphasis

added)). In making such a disclosure, the seller is required to disclose any

known material defects pertaining to, *inter alia*, additions to the property, such

as the sunroom in the case *sub judice*, and legal issues, such as the lack of a

building permit and occupancy permit in the case *sub judice*, affecting title or

use and enjoyment of the property. 68 Pa.C.S.A. § 7304(b)(7) and (16). If

"an item of information required to be disclosed is unknown or not available

to the seller, the seller may make a disclosure based on the best information

available to the seller[,]" and the seller is not obligated "to make any specific

investigation or inquiry in an effort to complete the property disclosure

statement." 68 Pa.C.S.A. § 7306 and § 7308. Thus, if the status of a material

_____

(Pa. Super. 2018). As such, nondisclosure under RESDL is a separate and distinct theory of relief that requires elements different from those required for a cause of action based on fraud. For example, "justifiable reliance" is not an element for establishing a violation of RESDL.

A review of Sellers' Rule 1925(b) statement reveals that Sellers do not challenge the trial court's verdict in favor of Buyers based on the failure to disclose under RESDL cause of action. In their appellate brief, however, Sellers assert that "[t]here was legally insufficient evidence for a verdict of [] failure to disclose[.]" Sellers' Brief at 30 (extraneous capitalization omitted). Because our disposition of Sellers' challenge to the verdict based upon the fraud cause of action encapsulates a discussion of RESDL and whether Sellers failed to make all necessary disclosures thereunder, we decline to find this issue waived. Moreover, the trial court, in addressing Sellers' issues, relied upon the June 29, 2021 opinion entered at the conclusion of the non-jury trial, which addressed the RESDL cause of action, and the record. In this instance, Sellers' failure to raise the issue in its Rule 1925(b) statement does not preclude our review.

defect pertaining to the addition, *i.e.*, a lack of building permit or occupancy permit, is unknown to the seller, the seller is required to disclose that he or she does not know that status.

In viewing the evidence in the light most favorable to Buyers as verdict winners, the lack of a building permit and an occupancy permit for the sunroom affected the good and marketable title of the residence and impacted Buyers' use and enjoyment of the sunroom. Therefore, the lack of these permits constituted a material defect. Gary Tweedlie testified that he did not obtain a building permit or occupancy permit for the addition and that he was uncertain whether the two former employees who constructed the sunroom obtained the necessary permits. As such, Gary Tweedlie violated RESDL when he failed to disclose that it was "unknown" whether a building permit or occupancy permit had been obtained for the addition. The notice to buyer contained within the RESDL form does not negate Sellers' obligations to indicate "yes, no, or unknown" to the questions regarding the building permit or occupancy permit. Therefore, a challenge to the trial court's verdict based upon RESDL is without merit.

In their fourth issue, Sellers challenge the trial court's award in the amount of $38,370.94 in favor of Buyers based upon the cost estimate to replace the sunroom. Sellers' Brief at 2. Sellers assert that the trial court

erred by awarding "demolition and replacement costs when the evidence did not establish that demolition and replacement was required."[17] *Id.*

In entering a verdict in favor of Buyers based upon the failure to disclose under RESDL cause of action, the trial court awarded damages in the amount of $38,370.94. This damage award was based upon an estimate for the replacement costs associated with the sunroom. *See* Buyers' Exhibit H. In awarding replacement costs, the trial court rejected Buyers' cost estimate to repair the sunroom in the amount of $45,366.94 as the actual damages incurred by Buyers as a result of Sellers' failure to disclose under RESDL.

Section 7311 of RESDL states that "any person who willfully or negligently violates or fails to perform any duty prescribed by any provisions of [RESDL] shall be liable in the amount of actual damages suffered by the buyer as a result of the violation of this chapter." 68 Pa.C.S.A. § 7311. As this Court recently noted, "RESDL does not define the term "actual damages[.]" *Phelps*, 190 A.3d at 1244. In *Phelps*, this Court held that "actual damages" for purpose of RESDL "**may be** determined by the repair costs, capped by the market value of the property." *Id.* at 1246 (emphasis added). Based upon the same logic employed by the *Phelps* Court and a review of the protective purpose of RESDL, which requires RESDL to be

---

[17] We note that Sellers' brief does not contain a specific section devoted to an argument in support of their fourth issue. *See* Sellers' Brief at 28 (breach of contract claim), 29 (RESDL and fraud claims), 33 (implied warranty of habitability), 36 (attorney's fees), and 44 (causation).

liberally construed to achieve the legislature's intended remedial goal, we similarly find that "actual damages" for purpose of RESDL may also be determined by the replacement costs, capped by the market value of the property. Damages must be assessed on a case-by-case basis for purpose of RESDL, and it remains within the discretion of the trial court to ascertain which costs, repair or replacement, best redresses the actual damages incurred by the buyer.

In the case *sub judice*, the township building code official testified that the addition of the sunroom required a building permit and an occupancy permit as part of its construction. N.T., 10/26/20, at 9, 32-34. The building code official further stated that in order to obtain a building permit, and ultimately an occupancy permit, the building code would require the sunroom to have a full foundation underneath it for support. *Id.* at 10. The sunroom, in its current condition, was not properly constructed to allow for a building permit or occupancy permit to be issued, primarily because the post foundation did not go below the frost line, as required by applicable building code. *Id.* at 10-11. A construction contractor evaluated the sunroom and provided both a replacement cost estimate and a repair cost estimate. *See* Buyers' Exhibit H. The replacement cost estimate was $38,370.94, and the repair cost estimate was $45,366.94. *Id.* The contractor explained that replacing the sunroom, which would include demolition of the existing sunroom and reconstruction with a proper foundation, would be more cost effective than repairing the structure because in replacing the structure you

did not have to worry about something breaking, thereby increasing the costs. *Id.* at 157.

In assessing damages based upon Sellers' violation of RESDL, we concur with the trial court, and the record supports, that Buyers were entitled to receive replacement cost value as actual damages pursuant to RESDL. The replacement costs, in the case *sub judice*, represented the most cost-effective means of remedying Buyers' damages and ultimately would allow their use and enjoyment of the sunroom once it was properly reconstructed in accord with building code provisions and upon the issuance of an occupancy permit. Therefore, Sellers' challenge to the verdict in the amount of $38,370.94 is without merit.

In their final issue, Sellers challenge the trial court's award of attorney's fees, as part of the verdict, in the amount of $11,508.93. Sellers' Brief at 36-43. Sellers argue that the trial court erred in finding that Buyers were entitled to attorney's fees pursuant to Section 2503 of the Judicial Code. *Id.* at 37-43.

It is well-established that "[u]nder the American Rule, applicable in Pennsylvania, a litigant cannot recover counsel fees from an adverse party unless there is express statutory authorization, a clear agreement of the parties, or some other established exception." **Trizechahn Gateway LLC v. Titus**, 976 A.2d 474, 482-483 (Pa. 2009). Absent an agreement between the parties, a party is entitled to reasonable attorney's fees, *inter alia*, as a sanction against another party "for dilatory, obdurate[,] or vexatious conduct

during the pendency of a matter." 42 Pa.C.S.A. § 2503(7). Recently, our Supreme Court defined the terms "dilatory, obdurate, and vexatious" as follows:

> **Vexatious** conduct is without reasonable or probable cause or excuse; harassing; annoying. [**O**]**bdurate** conduct may be defined in this context as stubbornly persistent in wrongdoing. Conduct is **dilatory** where the record demonstrates that counsel displayed a lack of diligence that delayed proceedings unnecessarily and caused additional legal work.

*County of Fulton v. Sec'y of Commonwealth*, 292 A.3d 974, 1014 (Pa. 2023) (citations and quotation marks omitted; emphasis in original).

In awarding attorney's fees pursuant to Section 2503(7), the trial court is required to first made specific findings of dilatory, obdurate, or vexatious conduct. *Township of South Strabane v. Piecknick*, 686 A.2d 1297, 1301 (Pa. 1996); *see also Sutch v. Roxborough Mem'l Hosp.*, 142 A.3d 38, 69 (Pa. Super. 2016) (stating, "[a]ny award of counsel fees pursuant to [Section] 2503(7) must be supported by a trial court's specific finding of dilatory, obdurate[,] or vexatious conduct" (citation, original quotation marks, and original brackets omitted)), *appeal denied*, 163 A.3d 399 (Pa. 2016). Typically, in considering a request for attorney's fees under Section 2503, an evidentiary hearing is required. *Sutch*, 142 A.3d at 69; *see also Kulp v Hrivnak*, 765 A.2d 796, 800 (Pa. Super. 2000) (stating, when "the record is unclear as to facts surrounding the litigant's conduct, a hearing must be held to develop the record").

"[A]n award of counsel fees is intended to reimburse an innocent litigant for the expenses the conduct of an opponent makes necessary." ***Sutch***, 142 A.3d at 69. Stated another way, an award of attorney's fees is limited to the reasonable attorney's fees and costs incurred as a direct result of the dilatory, obdurate, or vexatious conduct. ***See Thunberg v. Strause***, 682 A.2d 295, 298 (Pa. 1996).

Finally,

> Appellate review of a trial court's order awarding attorney's fees to a litigant is limited solely to determining whether the trial court palpably abused its discretion in making a fee award. If the record supports a trial court's finding of fact that a litigant violated the conduct provisions of the relevant statute providing for the award of attorney's fees, such award should not be disturbed on appeal.

***Thunberg***, 682 A.2d at 299 (citations omitted).

In awarding attorney's fees to Buyers in the case *sub judice*, the trial court stated,

> Counsel fees may be awarded as a sanction against the parties for dilatory, obdurate[,] and vexatious conduct [pursuant to] Section 2503. As testified at trial, [Sellers] filed preliminary objections indicating [Buyers] had to participate in arbitration. [Buyers] resisted and paid legal fees for that resistance. The [trial] court informed [Buyers] that arbitration was required and they, therefore, took the necessary steps for arbitration to occur. Contrary to the position of [Sellers] requiring arbitration, [as] supported by the [trial] court[, Sellers] failed to respond to the first request for arbitration filed by [Buyers].
>
> [Buyers] took action to move the case to arbitration which request was ignored by [Sellers. Buyers were] required, therefore, to replead and had to pay legal fees to do so. [Sellers] again[] insisted on arbitration [in which Buyers participated]. An award was entered in [Buyers'] favor and [Sellers] then applied for [a] trial [*de novo*].

> The conduct of [Sellers] in first requiring that [Buyers] participate in arbitration, then ignoring the request, then appealing the decision of the arbitrators was clearly an attempt by [Sellers] to delay the proceedings and to incur unnecessary legal fees for [Buyers]. The [trial] court finds [Sellers] had no basis for their conduct and that said conduct was dilatory, obdurate[,] and vexatious[. T]herefore, [the trial court awards] attorney's fees, in the amount of $11,508.93.

Trial Court Opinion, 6/29/21, at 6-7 (extraneous capitalization omitted).

A review of the record demonstrates that contained in the "Wherefore" clause of Buyers' complaint and their amended complaint was a blanket-request for, *inter alia*, attorney's fees. In so requesting, Buyers did not set forth the basis for their request. As discussed *supra*, Sellers filed a preliminary objection to the original complaint on the ground that the matter should first be submitted to arbitration, which the trial court sustained.[18] On

---

[18] The Agreement of Sale contained the following clause detailing the agreement between the parties that all disputes would be submitted to mediation:

> Buyer and Seller will submit all disputes or claims that arise from this Agreement, including disputes and claims over deposit monies, to mediation. Mediation will be conducted in accordance with the Rules and Procedures of the Home Sellers/Home Buyers Dispute Resolution System, unless it is not available, in which case Buyer and Seller will mediate according to the terms of the mediation system offered and endorsed by the local Association of Realtors. Mediation fees, contained in the mediator's fee schedule, will be divided equally among the parties and will be paid before the mediation conference. This mediation process must be concluded before any party to the dispute may initiate legal proceedings in any courtroom, with the exception of filing a summons if it is necessary to stop any statute of limitations from expiring. Any agreement reached through mediation and signed

June 6, 2017, Buyers submitted a request to the Pennsylvania Association of Realtors to initiate mediation. Buyers' Exhibit I. On June 27, 2017, the Pennsylvania Association of Realtors directed a letter to Buyers that stated, in pertinent part, as follows:

> Per the procedure of the Dispute Resolution System[,] the Pennsylvania Association of Realtors [] notified [Sellers] of your request to initiate mediation.
>
> We have not received any correspondence from [Sellers] indicating their interest in participation of mediation.

Buyers' Exhibit J. Thereafter, Buyers filed an amended complaint, stating, *inter alia*, that Sellers "failed to avail themselves of the opportunity to mediate, making this matter ripe for civil action." Amended Complaint, 7/31/17, at ¶18. Sellers filed preliminary objections to the amended complaint, arguing that the amended complaint was filed without Sellers' consent or leave of court and that arbitration of the matter was still pending. The trial court subsequently sustained the preliminary objections and directed that the parties summit the matter to arbitration. On September 11, 2019, a panel of arbitrators entered an award in favor of Buyers and against Sellers, which Sellers subsequently appealed.

---

> by the parties will be binding. Any agreement to mediate disputes or claims arising from this Agreement will survive settlement.

Buyers' Exhibit M at ¶27.

At trial, the following dialogue occurred relative to the introduction of

Buyers' Exhibit L, a schedule of the attorney's fees that were incurred:

[Buyers' Counsel:]  On the issues of fraud and [RESDL], we are going to be seeking attorney's fees.

Our argument, Judge, is that we did resist mediation and arbitration, which is reflected in the file; [] that was a matter of several conferences and arguments, that the [trial] court ultimately said you do have to go to mediation or arbitration. I want to show that we took all of the steps to do that, that [Sellers] then did not avail [themselves] of that.

And so to the extent they are going to argue a mitigation of damages because time has [passed], we didn't mitigate our damages. We are going to be arguing delay was on their side, and I am going to be presenting my attorney's fees.

And so **a portion of those attorney's fees would involve the fact that we resisted [arbitration but] did it anyway**. They said they didn't – they didn't avail themselves of that. The [trial] court then sent us to arbitration[.]

And then I would also offer that they were the ones who appealed the arbitration and brought us here today. All of that goes to them increasing attorney's fees.

[Sellers' Counsel:]  Your Honor, you found that the [Agreement of Sale] required arbitration. I am not sure how it is relevant. It was a condition in the contract. The [trial] court enforced that.

[Buyers' Counsel:]  I think – I think that is exactly right. I am not saying – I am not taking fault with what the [trial] court did. I am saying we

|                   |                                                                                                                                 |
|-------------------|---------------------------------------------------------------------------------------------------------------------------------|
|                   | then attempted to do the mediation and [Sellers] did not avail [themselves] of that.                                            |
| [Trial Court:]    | I will allow [Buyers' Exhibit L – Schedule of Attorney's Fees to be admitted] for that purpose.                                 |

N.T., 10/26/20, at 105-106 (extraneous capitalization omitted; emphasis added). The schedule of attorney's fees revealed that, between June 2, 2016, and July 28, 2020, Buyers incurred $11,508.93 in legal fees.

Upon review, we discern that the trial court abused its discretion in awarding attorney's fees. Although counsel for Buyers indicated that they would be seeking attorney's fees, a motion for attorney's fees was never filed. When a schedule of attorney's fees was introduced at trial, counsel for Sellers disputed Buyers' position that Sellers failed to avail themselves of the arbitration, asserting that the Agreement of Sale required arbitration and the trial court ordered the parties to participate in arbitration. Buyers concede that they resisted arbitration and, instead, choose to file a civil complaint. After the trial court sustained preliminary objections based on the need to submit the matter to arbitration, Buyers made a request to initiate arbitration. Twenty-one days after the request was made to initiate arbitration, the Pennsylvania Association of Realtors discontinued the request to initiate arbitration based upon Sellers' failure to respond. It is unclear from this correspondence the steps the Association took to engage Sellers before discontinuing the arbitration process. Thereafter, Buyers filed an amended complaint without Sellers' consent or leave of court.

The trial court found that "[t]he conduct of [Sellers] in first requiring that [Buyers] participate in arbitration, then ignoring the request, then appealing the decision of the arbitrators was clearly an attempt by [Sellers] to delay the proceedings and to incur unnecessary legal fees for [Buyers]" amounted to dilatory, obdurate, and vexatious conduct. The dialogue between counsel at trial (*see* N.T., 10/26/20, at 105-106) indicates factual disputes regarding the cause of the delays to bring this matter first to arbitration and then, ultimately, to trial. For example, Buyers first indicated that they resisted arbitration and incurred legal fees due to that resistance, and then argued Sellers did not avail themselves of arbitration and that they incurred legal fees as a result of Sellers' resistance. Because factual disputes existed, the trial court erred in not conducting an evidentiary hearing before determining whether an award of attorney's fees was established under Section 2503(7). Moreover, in awarding attorney's fees, the trial court awarded the total cost of legal fees incurred by Buyers from the inception of the case through July 2020. Counsel for Buyers conceded that some of those costs were due to Buyers' resistance to arbitration. As such, the trial court erred in failing to determine which portion of these fees may be attributable to Sellers' dilatory, obdurate, and vexatious conduct, if any. Therefore, we are constrained to remand this case in order that the trial court, upon the filing of a motion for attorney's fees, may conduct an evidentiary hearing to address such a request.

In sum, we find that the trial court erred as a matter of law and abused its discretion in entering judgment in favor of Buyers on the causes of action for breach of contract and fraud. We discern no error or abuse of discretion in the trial court's verdict in favor of Buyers on the RESDL cause of action. Because the trial court awarded the same judgment, $38,370.94, upon finding in favor of Buyers on each cause of action, we affirm the judgment in the amount of $38,370.94 based upon the RESDL violation. We vacate a portion of the judgment in the amount of $11,508.93, awarded for attorney's fees, and remand the case for further proceedings in accordance with this opinion.

Judgment in the amount of $38,370.94 affirmed. Judgment in the amount of $11,508.93 vacated. Case remanded. Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 11/01/2023